SUPREME COURT OF ARIZONA
En Banc

IN RE:  THE GENERAL ADJUDICATION ) Arizona Supreme Court
OF ALL RIGHTS TO USE WATER IN     ) No. WC-02-0003-IR
THE GILA RIVER SYSTEM AND SOURCE. )
                                  ) Maricopa County
                                  ) Superior Court
                                  ) Nos. W-1, W-2, W-3, W-4
                                  )      (Consolidated)
                                  )
                                  ) [Contested Case No. W1-206]
                                  )
                                  ) **O P I N I O N**
                                  )
_____   )

Interlocutory Appeal from the Superior Court of Maricopa County
The Honorable Eddward P. Ballinger, Jr., Judge

**AFFIRMED AND REMANDED**

_____

SPARKS, TEHAN & RYLEY, P.C.                          Scottsdale
     By  Joe P. Sparks
         John H. Ryley
         Susan B. Montgomery
         Robyn L. Kline
Attorneys for San Carlos Apache Tribe

RYLEY CARLOCK & APPLEWHITE, P.A.                       Phoenix
     By  John C. Lemaster
         Michael J. Brophy
         Cynthia M. Chandley
         Sean T. Hood
         William A. Richards
Attorneys for Phelps Dodge Corporation

UNITED STATES DEPARTMENT OF JUSTICE              Washington, D.C.
     By  Kelly A. Johnson
         Patrick Barry
         John L. Smeltzer
Attorneys for the United States

FENNEMORE CRAIG, P.C.                                    Phoenix
     By  Lauren J. Caster
         Michael J. Pearce
         Thomas R. Wilmoth
Attorneys for ASARCO L.L.C.

SALMON, LEWIS & WELDON, P.L.C.                          Phoenix
     By  M. Byron Lewis
         John B. Weldon, Jr.
         Mark A. McGinnis
         Jason P. Alberts
Attorneys for Salt River Valley Water Users' Association and
Salt River Project Agricultural Improvement and Power District

MOYES STOREY, LTD.                                      Phoenix
     By  Lee A. Storey
         Steve Wene
         Bradley K. Keogh
Attorneys for City of Safford

SALMON, LEWIS & WELDON, P.L.C.                          Phoenix
     By  Riney B. Salmon, II
         Ronnie P. Hawks
Attorneys for San Carlos Irrigation and Drainage District

BROWN & BROWN LAW OFFICES                               Pinetop
     By  David A. Brown
Attorneys for Franklin Irrigation District

LAW OFFICE OF L. ANTHONY FINES                          Tucson
     By  L. Anthony Fines
Attorneys for Gila Valley Irrigation District

Rodney B. Lewis                                        Chandler
John T. Hestand
Timothy L. Pierson
Ruth E. Koester
Attorneys for Gila River Indian Community

---

**H U R W I T Z**, Justice

¶1     This is an interlocutory appeal by the San Carlos
Apache Tribe ("Apache Tribe" or "Tribe") from an order issued in
the Gila River general stream adjudication.  *See* Ariz. Rev.

Stat. ("A.R.S.") §§ 45-251 to -264 (2003) (authorizing general stream adjudications). The central issue is whether claims advanced by the Tribe (and the United States on the Tribe's behalf) are precluded by a consent decree entered in 1935 by the United States District Court for the District of Arizona. We conclude that the decree precludes the Tribe's claims to additional water from the Gila River mainstem, but not to water from tributaries of the Gila.

**I.**

**A.**

¶2        The San Carlos Apache Reservation was established in 1872.  The Gila River Indian Community ("GRIC") Reservation was established in 1859.  Each reservation borders the Gila River.[1]

¶3        In the late 1800s, the federal government began considering a storage dam on the Gila River to provide water to the Tribe, GRIC, and non-Indian landowners in the Florence-Casa Grande area.  In 1924, Congress first appropriated funds for the San Carlos Irrigation Project ("San Carlos Project"), a reclamation project involving construction of the Coolidge Dam

---

[1]    "The Gila River originates in Western New Mexico and flows in a general westerly direction across Arizona to its confluence with the Colorado River."  *United States v. Gila Valley Irrigation Dist.*, 454 F.2d 219, 220 (9th Cir. 1972).  "The land through which the stream flows is semi-arid or desert land requiring irrigation for successful agricultural or horticultural results."  *Gila Valley Irrigation Dist. v. United States*, 118 F.2d 507, 508 (9th Cir. 1941).

on the Gila River and the creation of the San Carlos Reservoir. To facilitate the development of the San Carlos Project, the United States entered into agreements in 1924 with landowners along the Gila River (the "Landowners' Agreements"). Under these agreements, the landowners conveyed water rights appurtenant to their lands to the United States in exchange for San Carlos Project waters.

¶4        In 1925, the United States filed a complaint (the "Complaint") in the United States District Court for the District of Arizona on behalf of itself, the Tribe, GRIC, and landowners within both the San Carlos Project and the Florence-Casa Grande Project (an earlier reclamation project on the Gila River). The Complaint named as defendants numerous individuals, irrigation districts, canal companies, and corporations. The Complaint alleged that GRIC, the Apache Tribe, and the reclamation projects were entitled to certain quantities of water from the Gila River and its tributaries and that the defendants' claims were "in conflict with or adverse to" the rights of the tribes and the projects. Compl. ¶ 7. The Complaint sought a determination of the rights of the parties "to the use of the waters flowing in said Gila River and its said tributaries." *Id.* ¶ 8.

¶5        Two years later, the United States filed an amended complaint (the "Amended Complaint"). The Amended Complaint

4

denominated all parties other than the tribes and the United States as defendants, but explained that landowners "who have by contracts devoted their water rights to the said Florence-Casa Grande Project, and the San Carlos Project . . . are interested on the side of the United States in this action." Am. Compl. ¶ 15. In contrast to the initial Complaint, which sought an adjudication of rights to the "waters from said Gila River and its tributaries," Compl. ¶ 8, the Amended Complaint sought only to adjudicate the parties' rights to the "waters of the Gila River." Am. Compl. ¶¶ 14, 15.

¶6        Litigation continued over the next eight years. In 1935, the United States entered into stipulations dismissing without prejudice all defendants who maintained claims only to waters of the Gila River tributaries. The remaining parties stipulated to the entry of the Globe Equity Decree (the "Decree"). The Decree states that the parties "have concluded and settled all issues in this cause" and that the Decree "embodie[s] . . . and confirm[s]" the settlement of the parties. The Decree then "defin[es] and adjudicat[es] the[] claims and rights" of the parties by listing the dates of priority and amounts of water to which each is entitled. The Decree also specifies the places at which the parties may divert water.

¶7        The Decree is administered by a Water Commissioner appointed by the district court. The district court has

5

retained jurisdiction to enforce and interpret the Decree. Litigation interpreting the Decree began soon after its entry and has continued ever since.[2]

**B.**

¶8 Arizona law provides for the determination of multiple water use claims through general stream adjudications. *See* A.R.S. §§ 45-251 to -264. The Gila River general stream adjudication began in 1981 when we ordered a series of petitions consolidated into a single proceeding. *See In the Matter of the Rights to the Use of the Gila River* ("*Gila I*"), 171 Ariz. 230, 232-33, 830 P.2d 442, 444-45 (1992).[3] In 1995, the Legislature declared that "an early focus by the general stream adjudication courts" should be "the trial of Indian and non-Indian federal

---

[2] The first Ninth Circuit decision involving the Decree was *Gila Valley Irrigation District v. United States*, 118 F.2d 507 (9th Cir. 1941), and the most recent was *United States v. Gila Valley Irrigation District*, 117 F.3d 425 (9th Cir. 1997).

[3] The history of the Gila River general stream adjudication is documented in previous decisions of this and other courts. *See Arizona v. San Carlos Apache Tribe of Ariz.*, 463 U.S. 545, 557-59 (1983) (subsection entitled "The Arizona Cases"); *Gen. Adjudication of All Rights to Use Water in the Gila River Sys. & Source*, 201 Ariz. 307, 309-10 ¶¶ 1-2, 35 P.3d 68, 70-71 (2001); *Gen. Adjudication of All Rights to Use Water in the Gila River Sys. & Source*, 198 Ariz. 330, 333-34 ¶¶ 1-2, 9 P.3d 1069, 1072-73 (2000); *Gen. Adjudication of All Rights to Use Water in the Gila River Sys. & Source*, 195 Ariz. 411, 413-14 ¶¶ 1-5, 989 P.2d 739, 741-42 (1999); *Gen. Adjudication of All Rights to Use Water in the Gila River Sys. & Source*, 175 Ariz. 382, 384-85, 857 P.2d 1236, 1238-39 (1993); *Gila I*, 171 Ariz. at 232-33, 830 P.2d at 444-45; *United States v. Superior Court*, 144 Ariz. 265, 270-71, 697 P.2d 658, 663-64 (1985) (subsection entitled "The Controversy").

6

water claims." 1995 Ariz. Sess. Laws, ch. 9, § 25(C). The superior court accordingly directed interested parties to file summary judgment motions as to whether claims raised by or on behalf of the Tribe in the general stream adjudication were precluded by the Decree.

¶9         In 2001, GRIC, ASARCO LLC, Phelps Dodge Corporation, the City of Safford ("Safford"), the Gila Valley Irrigation District ("GVID"), the Franklin Irrigation District ("FID"), and the San Carlos Irrigation and Drainage District ("SCIDD") filed summary judgment motions. These motions argued that the Decree precludes the Tribe, and the Government on its behalf, from asserting additional claims to water from the Gila River and its tributaries. Some motions also contended that under the Supreme Court's opinion in *Nevada v. United States*, 463 U.S. 110 (1983), non-parties to the Decree could assert the claimed preclusive effect of the Decree. The Tribe also filed a summary judgment motion, arguing that the Decree does not preclude its claims to additional water from the Gila River or the San Carlos River, a tributary of the Gila. The Tribe also argued that the Landowners' Agreements preclude GRIC from asserting claims to the San Carlos River.

¶10         On May 17, 2002, the superior court granted partial summary judgment to ASARCO, Phelps Dodge, Safford, SCIDD, GVID, and FID. The court held that the Decree was limited to the Gila

7

River mainstem and did not cover its tributaries. The superior court also held that non-parties to the Decree could assert its preclusive effect.[4]

¶11 Given the lengthy nature of general stream adjudications, we have provided for interlocutory review of certain superior court orders. Special Procedural Order Providing for Interlocutory Appeals and Certifications (September 26, 1989); *see Gila I*, 171 Ariz. at 233 n.2, 830 P.2d at 445 n.2 (discussing the Special Procedural Order). We granted interlocutory review of six issues raised by the Apache Tribe and one issue raised by Phelps Dodge. Each of these issues turns on the preclusive effect of the Decree.[5]

---

[4] On March 7, 2002, the superior court had entered an order holding that "neither GRIC nor the United States on behalf of GRIC shall be entitled to claim water rights relating to the mainstem of the Gila River . . . except to the extent that such rights were granted to them by the *Globe Equity Decree*." The superior court's May 17, 2002 order, which is the subject of this appeal, refers to and incorporates by reference this previous order.

[5] The six issues raised by the Tribe are as follows:

(1) "Where the San Carlos Apache Reservation was established pursuant to the Apache Treaty of 1852 as a Permanent Tribal Homeland of nearly 2 million acres, with nearly 1,500,000 acres on the Gila River, did the Superior Court err when it denied the Apache Tribe a trial on the merits of its claims by granting a motion for partial summary judgment holding that the doctrine of res judicata preclude[s] the Tribe from claiming water for its Tribal homeland in excess of the United States['] right to water for 1,000 acres under the Globe Equity Decree?" (2) "Did the Superior Court err in ruling that [the] statement of facts in its Amended Order in W1-203 involving GRIC also applies to the

¶12 This Court has jurisdiction over this interlocutory appeal pursuant to Article 6, Section 5(3) of the Arizona Constitution and the Special Procedural Order.[6] We review grants

---

Apache Tribe in W1-206?" (3) "Did the Trial Court err when it denied the Apache Tribe's request for an evidentiary hearing on the adequacy of the representation of the United States as its Trustee under § 42(1)(e) of the *Restatement (Second) of Judgments*[,] and ruled that res judicata applies to the Apache Tribe under [the] Decree?" (4) "Did the Superior Court err where it failed to conclude that the United States lacked any authority from Congress to represent the Apache Tribe in Globe Equity or to dispose of Tribal property which would preclude the application of res judicata; or alternatively, where it failed to conclude that the issue of lack of authority is a disputed genuine issue[] of material fact?" (5) "Did the Superior Court err in failing to determine that the *Landowners' Agreement of 1924* or the Decree, specifically preclude GRIC, and the United States on behalf of GRIC, from claiming any water rights to the San Carlos River in the Gila River stream adjudication?" (6) "Did the Superior Court err when it ruled that the 'mutuality exception' under *Nevada v. United States*, 463 U.S. 110 (1983), does not apply to bar any claims that the parties to the Decree may have to any of the tributaries of the Gila River in the Gila River stream adjudication?"

Phelps Dodge raised the following issue:

"Did the Superior Court err when it found that the claims of the parties in the *Globe Equity 59* proceedings to waters of the Gila River's tributaries had been 'split' from those same parties' claims to the main stem waters of the Gila River, and therefore that such tributary claims had not been part of the GE 59 Decree and were not affected by the same preclusive, *res judicata* effects that the GE 59 Decree had on the parties' claims to the river's main stem?"

[6] Our Special Procedural Order "is the exclusive remedy for the presentation of interlocutory issues to this court in this adjudication" and was issued pursuant to Article 6, Section 5 of the Arizona Constitution, A.R.S. § 45-259 and § 12-2101 (2003), and Rule 19(a)(3) and (f) of the Arizona Rules of Civil Appellate Procedure. *Gila I*, 171 Ariz. at 233 n.2, 830 P.2d at 445 n.2.

of summary judgment de novo.  *See Duncan v. Scottsdale Med. Imaging, Ltd.*, 205 Ariz. 306, 308 ¶ 2, 70 P.3d 435, 437 (2003).[7]

## II.

¶13     Federal law dictates the preclusive effect of a federal judgment.  *See Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 507 (2001) (noting that state courts cannot give federal judgments "merely whatever effect they would give their own judgments, but must accord them the effect that [the United States Supreme] Court prescribes"); *Heck v. Humphrey*, 512 U.S. 477, 488 n.9 (1994) ("State courts are bound to apply federal rules in determining the preclusive effect of federal-court decisions on issues of federal law."); *First Pac. Bancorp v. Helfer*, 224 F.3d 1117, 1128 (9th Cir. 2000) ("When considering the preclusive effect of a federal court judgment, we apply the federal law of claim preclusion."); Restatement (Second) of Judgments ("Second Restatement") § 87 (1982) ("Federal law determines the effects under the rules of res judicata of a judgment of a federal court.").  Thus, our task is to give the Decree the same preclusive effect as the federal courts would give it.

_____

[7]     After granting review, we entered an order permitting "[a]ny party that properly filed a notice of appearance in this matter" to submit a brief.  Pursuant to that order, the United States, the Apache Tribe, GRIC, Phelps Dodge, ASARCO, SCIDD, Safford, GVID, FID, and Salt River Project ("SRP") filed briefs.

¶14     We deal today with the issue of claim preclusion,

formerly referred to as res judicata.

> Simply put, the doctrine of *res judicata* provides that
> when a final judgment has been entered on the merits
> of a case, 'it is a finality as to the claim or demand
> in controversy, concluding parties and those in
> privity with them . . . as to every matter which was
> offered and received to sustain or defeat the claim or
> demand . . . .'

*Nevada*, 463 U.S. at 129-30 (quoting *Cromwell v. County of Sac*,

94 U.S. 351, 352 (1876)) (internal alteration omitted); *see also*

*Montana v. United States*, 440 U.S. 147, 153 (1979) ("Under res

judicata, a final judgment on the merits bars further claims by

parties or their privies based on the same cause of action.").

The defense of claim preclusion has three elements:  (1) an

identity of claims in the suit in which a judgment was entered

and the current litigation, (2) a final judgment on the merits

in the previous litigation, and (3) identity or privity between

parties in the two suits.  *Blonder-Tongue Lab., Inc. v. Univ. of

Ill. Found.*, 402 U.S. 313, 323-24 (1971).[8]

---

[8]     Only claim preclusion is at issue in this case.
"'[C]onsent judgments ordinarily support claim preclusion but
not issue preclusion.'"  *Arizona v. California*, 530 U.S. 392,
414 (2000) (quoting 18 Charles Alan Wright, Arthur R. Miller &
Edward H. Cooper, *Federal Practice and Procedure* § 4443 (1981)).
This is because issue preclusion (formerly referred to as
collateral estoppel) "attaches only when an issue of fact or law
is actually litigated and determined by a valid and final
judgment, and the determination is essential to the judgment.
In the case of a judgment entered by confession, consent, or
default, none of the issues is actually litigated."  *Id.*
(internal alterations and citations omitted).

¶15     The parties agree that the Decree is a final judgment and satisfies the second element of claim preclusion. The parties differ sharply, however, as to whether the other two elements of claim preclusion – an identity of claims and privity – are present in this case. We address these issues in turn below.

### III.

¶16     The parties advance very different positions as to what claims were asserted in the Globe Equity litigation and adjudicated by the Decree. The Tribe argues that the United States (as trustee) asserted only a theory of prior appropriation. The Tribe contends that the Decree therefore does not address the Tribe's "aboriginal" water rights or *Winters* reserved water rights.[9] The Tribe also argues that the Decree did not involve claims to the tributaries of the Gila River, particularly the San Carlos River. The United States agrees with the Tribe with respect to claims to tributaries of the Gila River, but does not expressly contest that the Decree covered all claims to water from the Gila River mainstem. GRIC takes no position as to whether the various parties' motions for

---

[9]     As the Supreme Court has noted, its decision in *Winters v. United States*, 207 U.S. 564 (1908), established that when the federal government creates an Indian reservation, it "impliedly reserve[s] a right to the amount of . . . water necessary to effectuate the purposes" of the reservation. *Nevada*, 463 U.S. at 116 n.1.

summary judgment should have been granted, but argues that the Globe Equity litigation sought to quantify water rights for only the Gila River mainstem.

¶17      In contrast, Phelps Dodge, SCIDD, Safford, GVID and FID argue that the Decree resolved all of the Tribe's claims to water both in the Gila River mainstem and its tributaries.  SRP argues that the Decree precludes the Tribe from asserting additional claims to the Gila River mainstem, but takes no position with respect to the tributaries.  ASARCO contends that the Apache Tribe and the United States are precluded only from asserting claims for additional water from the Gila River and the San Carlos River, but that they may assert claims to waters from other Gila River tributaries; ASARCO also argues that the Decree awarded waters of the San Carlos River to ASARCO through its predecessor, Kennecott Copper Corporation ("Kennecott").

**A.**

¶18      The Supreme Court of the United States has never precisely defined the test for determining if there is an identity of claims in two actions for purposes of claim preclusion.  Before the adoption of the Federal Rules of Civil Procedure in 1938, federal case law focused on the "causes of action" asserted in the two suits.  *See, e.g.*, *United States v. Memphis Cotton Oil Co.*, 288 U.S. 62, 67-68 (1933) ("A 'cause of action' may mean one thing for one purpose and something

13

different for another."); *see also* O.L. McCaskill, *Actions and Causes of Action*, 34 Yale L.J. 614, 614 (1925) ("The cause of action has not been understood.  Eminent writers . . . have failed to agree as to its character and scope.").  In those days, "the courts were prone to associate claim with a single theory of recovery, so that, with respect to one transaction, a plaintiff might have as many claims as there were theories of the substantive law upon which he could seek relief against the defendant."  Second Restatement § 24 cmt. a.

¶19    Under this approach, the federal courts developed a number of tests for determining whether two causes of action were the same for purposes of claim preclusion.  One test focused on the "primary right" of the plaintiff that allegedly had been infringed.  *See, e.g.*, *Baltimore S.S. Co. v. Phillips*, 274 U.S. 316, 321 (1927) ("A cause of action does not consist of facts, but of the unlawful violation of a right which the facts show.").  Another test focused on whether the same evidence considered in the first suit would sustain the second.  *See* Restatement of Judgments ("First Restatement") § 61 (1942) ("[T]he plaintiff is precluded from subsequently maintaining a second action based upon the same transaction, if the evidence needed to sustain the second action would have sustained the first action."); *see also* John F. Wagner, Jr., Annotation, *Proper Test to Determine Identity of Claims for Purposes of*

14

*Claim Preclusion by Res Judicata Under Federal Law*, 82 A.L.R. Fed. 829 (1987) (collecting case law establishing different tests).

¶20     After the adoption of the Federal Rules of Civil Procedure in 1938, the "tests for determining the identity of a claim or cause of action . . . developed concomitantly with the evolution of modern civil procedure."  Wagner, *supra*, at 836; *see also Nevada*, 463 U.S. at 130 (noting that "[d]efinitions of what constitutes the 'same cause of action' have not remained static over time," and citing the changes between the First and Second Restatements of Judgments).  "With the adoption of the Federal Rules of Civil Procedure and the unified form of action . . . much of the controversy over 'cause of action' abated." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966). Thereafter, the test for determining the identity of claims focused on the "transaction" or "natural grouping or common nucleus of operative facts" making up the plaintiff's claims. Second Restatement § 24 cmt. b; *see also Williamson v. Columbia Gas & Elec. Corp.*, 186 F.2d 464, 470 (3d Cir. 1950) (noting that the "modern systems of pleading, especially the federal system, as exemplified by the free permissive joinder of claims, liberal amendment provisions, and compulsory counterclaims" altered the definition of "claim" for purposes of claim preclusion).

¶21     "Seven of the thirteen federal circuit courts, as well

as the Claims Court have thus far expressly adopted the [Second] Restatement's transactional approach" to defining a claim for purposes of claim preclusion. Wagner, *supra*, at 837. While the Supreme Court has not explicitly adopted the Second Restatement's transactional approach, it has applied a transactional analysis in several different contexts in which the definition of "claim" was legally significant. *See, e.g.*, *United Mine Workers*, 383 U.S. at 725 (holding that for purposes of pendent jurisdiction the "state and federal claims must derive from a common nucleus of operative fact"); *Reeves v. Beardall*, 316 U.S. 283, 286 (1942) (holding that because the plaintiff's "two claims arose out of wholly separate and distinct transactions," the district court's decision on one claim was a final judgment for purposes of Rule 54(b)).

¶22    We assume, without deciding, that the federal courts would utilize the Second Restatement's transactional test for determining the identity of claims in this case. Under the Second Restatement, the determination of what "factual grouping constitutes a 'transaction'" is "not capable of mathematically precise definition; it invokes a pragmatic standard to be applied with attention to the facts of the case." Second Restatement § 24(2), cmt. b. Defining the transaction that makes up a claim involves a consideration of "whether the facts are related in time, space, origin, or motivation, whether they

16

form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations . . . ." *Id.* § 24(2).

¶23     Under the Second Restatement test, the claims to the Gila River mainstem asserted by the United States in the Globe Equity litigation would not seem to be part of the same "transaction" as its claims to the tributaries. Because claims to water depend in part on the location of the party asserting the claim, the facts needed to establish a claim to the Gila River mainstem are necessarily spatially distinct from those needed to establish a claim to a tributary. The "origins" of these claims may also be dissimilar. Moreover, the dismissal without prejudice from the Globe Equity litigation of all defendants with claims to the tributaries indicates that the parties determined that the most "convenient trial unit" for claims to the Gila River mainstem was one that excluded the tributaries. That dismissal also indicates that the parties expected that claims to waters of the tributaries would be resolved later.

**B.**

¶24     We need not, however, decide today whether the Second Restatement test, or the earlier "cause of action" test of the

17

First Restatement, governs the preclusive effect of the Decree.[10]

Whatever the appropriate test for establishing identity of claims in two actions, it is clear that parties to a consent decree can agree to limit the decree's preclusive effects. "The basically contractual nature of consent judgments has led to general agreement that preclusive effects should be measured by the intent of the parties."  18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4443 (1981).[11]  Thus, while a judgment will ordinarily preclude later

---

[10]   Because the Decree was entered in 1935, it is not clear under federal law what test would have applied then.  *See Nevada*, 463 U.S. at 131 n.12 (noting that more than one test for identity of claims was used in 1944 when the Orr Ditch decree was entered).

[11]   Many federal cases recognize this principle.  *See, e.g.*, *United States ex rel. Barajas v. Northrop Corp.*, 147 F.3d 905, 911 (9th Cir. 1998) ("A settlement can limit the scope of the preclusive effect of a dismissal with prejudice by its terms."); *Satsky v. Paramount Commc'ns, Inc.*, 7 F.3d 1464, 1468 (10th Cir. 1993) (quoting same language from Wright & Miller, *supra*, § 4443); *Int'l Union of Operating Eng'rs-Employers Constr. Indus. Pension, Welfare & Training Trust Funds v. Karr*, 994 F.2d 1426, 1432-33 (9th Cir. 1993) (holding that parties wishing to "preclude the application of res judicata to a future action . . . can reserve that right" by agreement, and referring to Wright & Miller, *supra*, § 4443); *Keith v. Aldridge*, 900 F.2d 736, 740-41 (4th Cir. 1990) (citing Wright & Miller, *supra*, § 4443 for the proposition that "[w]hen a consent judgment entered upon settlement by the parties of an earlier suit is invoked by a defendant as preclusive of a later action, the preclusive effect of the earlier judgment is determined by the intent of the parties"); *May v. Parker-Abbott Transfer & Storage, Inc.*, 899 F.2d 1007, 1010 (10th Cir. 1990) ("This court recognizes that consent decrees are of a contractual nature and, as such, their terms may alter the preclusive effects of a judgment.") (citing Wright & Miller, *supra*, § 4443).

litigation of "all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction," Second Restatement § 24(1), that rule does not apply when the parties "have agreed in terms or in effect that the plaintiff" may reserve a portion of its claim, *id*. § 26(1)(a). This is because the "main purpose" of precluding further litigation on a claim "is to protect the defendant from being harassed by repetitive actions based on the same claim. The rule is . . . not applicable where the defendant consents, in express words or otherwise" to allow the plaintiff to pursue his claim in multiple suits. *Id*. § 26 cmt. a.[12]

¶**25**    The parties' agreement to limit the preclusive effect of a judgment by permitting the plaintiff to try only a portion of its claim may be either express or implied. *Id.* § 26(1)(a). The Second Restatement elucidates this point:

> After a collision in which A suffers personal injuries and property damage, A commences in the same jurisdiction one action for his personal injuries and another for the property damage against B. B does not

---

[12]    In determining the preclusive effect of the Decree, we are mindful that "since consent decrees . . . have many of the attributes of ordinary contracts, they should be construed basically as contracts." *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 236 (1975) (footnote omitted). The Decree's "scope . . . must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971). Thus, the Decree "must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation." *Id.*

19

make known in either action his objection (usually called "other action pending") to A's maintaining two actions on parts of the same claim. After judgment for A for the personal injuries, B requests dismissal of the action for property damage on the ground of merger. Dismissal should be refused as B consented in effect to the splitting of the claim.

*Id.* § 26 cmt. a, illus. 1. Applying this principle, the Ninth Circuit has held that a county's failure to object in state court proceedings to a plaintiff's attempt to reserve its Fifth Amendment takings claim for federal court impliedly permitted the plaintiff to bring the later federal action. *Dodd v. Hood River County*, 59 F.3d 852, 861-62 (9th Cir. 1995).

¶26    In addition to permitting parties to limit the preclusive effects of their judgments, federal law recognizes the power of a court in a first action to reserve the plaintiff's right to maintain a second action on part of a claim. *Id.* at 862 ("A court may be able to reserve part of a plaintiff's claim for subsequent litigation by expressly omitting any decision with regard to it in the first judgment."); Second Restatement § 26(1)(b). Thus, when a court determines that its judgment is without prejudice "to a second action on the omitted part of the claim," that determination prevents the first judgment from obtaining preclusive effect in the second action. Second Restatement § 26 cmt. b; *see also* Wright & Miller, *supra*, § 4413 ("A judgment that expressly leaves open the opportunity to bring a second action on

20

specified parts of the claim or cause of action that was advanced in the first action should be effective to forestall preclusion.").

¶27    Given this well-recognized right of the parties and the courts to limit the preclusive effect of their judgments, we must determine what claims were actually adjudicated by the Globe Equity litigation and what preclusive effect the Decree was intended to have.

**1.**

¶28    The first issue we address is whether the Decree adjudicated claims to the tributaries of the Gila River.  The starting point in that analysis is the language of the Complaint and the Amended Complaint.  The initial Complaint stated that the

> sole source of water necessary and proper for the economical and successful irrigation and cultivation of such lands under the said San Carlos Irrigation Project is the said Gila River *together with its tributaries thereto* lying to the East of the said Gila Indian Reservation, to-wit:  The San Pedro River, the San Carlos River, San Francisco River, Blue River and Eagle Creek[.]

Compl. ¶ 5 (emphasis added).  The prayer for relief in the initial Complaint asked

> [t]hat the court by its decree determine the relative rights of the parties hereto, in area and extent, and in duration according to their relative rights respectively in priority of appropriation, in to and of the waters of the said *Gila River and its tributaries* in Arizona and New Mexico, including

natural flow and flood waters, to the end that it may be known how much of said waters may be diverted from said river by the parties hereto and for what purposes, where, by what means of diversion and with what priorities.

*Id.* ¶ 8 (emphasis added). The Complaint specifically referred to the "Gila River and its tributaries" numerous times, including the report of the waters previously appropriated by the Apache Tribe, *id.* ¶ 3(c), the identification of the defendants and their claims, *id.* ¶ 7, and the prayer for relief, *id.* ¶ 8.

**¶29** In contrast, the Amended Complaint specifically excludes the Gila River tributaries. In defining the defendants' claims, the Amended Complaint states:

Each of the defendants . . . claims some right to divert water from the Gila River as it flows between a line 10 miles east of the parallel to the dividing line between Arizona and New Mexico, and the confluence of the Salt River with the Gila River, and *after the following tributaries of the Gila River*, the San Francisco River, the San Carlos River, the San Pedro River, and the Santa Crus [sic] River, respectively, *have joined the main stream*, and all but a few of said diversions being in the District of Arizona; or the said defendants claim some right to store the water of said river, or of some tributary thereof, *either within or above the stretch of the same as just described*.

Am. Compl. ¶ 15 (emphasis added). Thus, the portion of the Gila River placed in dispute by the Amended Complaint was the Gila River *after* the tributaries join the mainstem.

**¶30** The prayer for relief in the Amended Complaint

22

requested

> [t]hat the Court, by its decree, determine the rights of the parties hereto to the waters of said river and its tributaries and the rights of said parties to divert water from *said river within the area aforesaid* and for storage above, to the end that it may be known how much of said waters may be diverted from *said river* by the parties hereto and for what purposes, where, by what means of diversion and with what priorities.

*Id.* Prayer (emphasis added). Although the prayer at first seems to suggest that the parties' rights to water in the Gila River tributaries are in fact at issue, it then makes clear that the Government is only seeking to adjudicate rights in the "area aforesaid" and from "said river" – language consistent with the notion that the Amended Complaint was directed only to the parties' rights to waters in the Gila River mainstem. This conclusion is buttressed by paragraph fifteen of the Amended Complaint which makes clear that the "area aforesaid" is the "Gila River . . . after the following tributaries . . . have joined the main stream." *Id.* ¶ 15.

¶31 The procedural history of the Decree reinforces this conclusion. After filing the Amended Complaint, the United States obtained the dismissal of all defendants with claims solely to the tributaries of the Gila River. The Decree explicitly states that certain defendants, all of whom maintained claims to the tributaries, were dismissed "because their claims and rights, if any, were and are outside the scope

23

of said suit as same was and is outlined and defined in the amended complaint herein." Both the defendants and their "claim[s] or rights to the use of water which said defendants . . . now or hereafter may have" were dismissed "without prejudice." This was because "five stipulations between the plaintiff and the defendants" established "that the dismissal of said defendants should be accomplished upon motion of the plaintiff and Order of this Court."

¶32    The effect of this dismissal without prejudice was to exclude from the Globe Equity litigation any claims by the dismissed defendants to the tributaries of the Gila River. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396 (1990) (A "dismissal without prejudice is a dismissal that does not operate as an adjudication upon the merits and thus does not have a res judicata effect.") (internal citation and alterations omitted). Indeed, the Decree expressly so states, providing that defendants with claims to the tributaries would "be left as though they never had been named or made parties defendant." The court "confirmed" that the dismissals were "made a part of this decree to protect [the defendants'] rights in that respect." Given that the Decree made plain that it was not resolving the claims of the dismissed defendants to water of the tributaries, it naturally follows that the Decree also did not adjudicate the Tribe's claims to the tributaries, as the

24

dismissed defendants would have been necessary parties to any such adjudication.

¶33    Our conclusion that claims to water from the tributaries were not adjudicated by the Decree is further supported by the Decree's schedule of rights and priorities. The Decree states that "the Gila River is the stream from which the water called for under each of said rights is and may be diverted."  The portion of the Decree establishing the rights of the various parties to use the waters of the Gila River refers only to the "waters of the Gila River."  In enumerating the rights of GRIC, the Apache Tribe, the San Carlos Project, and the Gila Crossing District to divert water, the Decree specifically refers to their rights to "divert . . . the waters of the Gila River."  Similarly, in establishing the parties' storage rights, the Decree refers to "[t]he right . . . to store the waters of the Gila River in the San Carlos Reservoir." Finally, Article XIII states:

> [A]ll of the parties to whom rights to water are decreed in this cause . . . are hereby forever enjoined and restrained from asserting or claiming--as against any of the parties herein . . . --any right, title or interest in or to the waters *of the Gila River,* or any thereof, except the rights specified, determined and allowed by this decree, and each and all thereof are hereby perpetually restrained and enjoined from diverting, taking or interfering in any way with the waters of the Gila River or any part thereof . . . .

25

(Emphasis added.)[13]

**2.**

¶34     Notwithstanding this compelling evidence that the Decree was intended to adjudicate only rights in the Gila River mainstem, various parties arguing to the contrary point to language in the Decree regarding the proper method for measuring the amount of water to be diverted by the so called "upper valley defendants":

> [P]rovided further that the drafts on the stream by the upper valley[] defendants shall be limited to a seasonal year diversion which will result in an actual consumptive use from the stream of not to exceed 120,000 acre feet of water; said consumptive use made in any seasonal year shall be determined by adding the recorded flows at a gauging station located in the Gila River at Red Rock Box Canyon above the heading of the Sunset Canal in New Mexico *and a gauging station located in the San Francisco River immediately above its confluence with the Gila River* and deducting from said sum the recorded flows at a gauging station located on the Southern Pacific Railway bridge crossing the Gila River near Calva, Arizona[.]

(Emphasis added.)  Rather than establishing any right to the waters of the San Francisco River, however, this provision merely establishes a method of measuring flows in the Gila River based on readings at certain gauging stations.  Some of the stations used to measure those flows are located on the

---

[13]     Several parties argue that we should read the phrase "or any thereof" in Article XIII to mean "or any tributary thereof." We decline that invitation.  In context, the phrase is most naturally read as referring to a portion of the waters of the Gila River mainstem.

tributaries that feed into the Gila River, but the Decree does not establish any party's right to divert from those flows as opposed to the mainstem itself.

¶35     ASARCO also argues that the Decree awarded Kennecott, its predecessor, "the water from the San Carlos River." ASARCO relies on a provision in the Decree describing Kennecott's right to divert water when upstream defendants have been given water from the "available storage in the San Carlos Reservoir." When that happens, Kennecott is entitled to an apportionment "of the natural flow of the Gila River" as "gauged by and deemed to correspond with the natural flow of the Gila River and San Carlos River at the points where said streams enter the San Carlos Reservoir." ASARCO claims that this language gives it rights to San Carlos River water.

¶36     We do not so read the Decree. Because the Decree establishes the parties' rights to water both from the flow of the Gila River and from waters stored in the San Carlos Reservoir, the Decree required some method for gauging how much of each source was being used. The reference to the San Carlos River upon which ASARCO relies simply enables the Water Commissioner to measure the flow of water *in the Gila River* to

27

which Kennecott is entitled.[14]  The provision does not award Kennecott any water from the San Carlos River, nor does any other portion of the Decree.

**3.**

¶37      SCIDD argues that "the practical impacts" of the Decree indicate that it must have adjudicated rights to waters of the tributaries of the Gila River in addition to the mainstem.  SCIDD asserts that because "the Gila River is largely a product of the inflows from the Gila River's tributaries[,] [i]f those tributaries can be dammed or diverted with impunity, the protections offered by the *Globe Equity* Decree are illusory."  It does not follow, however, that simply because the rights of parties on the tributaries were not adjudicated in the Globe Equity litigation, such rights are limitless or that parties with claims to the waters of the tributaries may divert the flow of those tributaries with "impunity."  The rights of those with claims to the Gila River tributaries will be determined in this Gila River general stream adjudication.  To the extent that those rights conflict with rights vested under the Decree, that issue can be addressed by the superior court in future proceedings.

---

[14]   Kennecott's property was not located on the San Carlos River, but rather on the Gila River, well downstream from the confluence of the San Carlos and Gila Rivers.

28

**4.**

¶38     In sum, we conclude that the Decree adjudicated only claims to the Gila River mainstem and not to its tributaries. The Decree therefore has no preclusive effect as to the tributaries.

**C.**

¶39     The next issue is what claims to the mainstem were adjudicated by the Decree.  The Tribe argues that the Decree adjudicated only its appropriative rights and not aboriginal or *Winters* rights.  Other parties claim that the Decree adjudicated all claims of the Tribe to the mainstem.

¶40     The starting point is once again the language of the Amended Complaint.   The Amended Complaint first alleges generally that the members of the Apache Tribe were "occupants and possessors of large areas of land with water rights appertaining thereto."  Am. Compl. ¶ 3.  The Amended Complaint declares that the United States has the power to assert claims to water on behalf of the Apache Tribe and GRIC because

> on its acquisition from Mexico (by the Treaty of Guadalupe-Hidalgo and the Gadsden Purchase) of the territory within which are the lands occupied by . . . the Apache Indians . . . [the United States] became and ever since has remained the guardian of the Indian inhabitants, including the said Pimas and Apaches, and became the owner of the soil of said territory . . . . The United States, upon such acquisition, furthermore became the full sovereign of said territory, having both national and municipal or State sovereignty; and it had plenary power over said lands and waters.

29

*Id.* ¶ 7.  The Amended Complaint goes on to allege that

> [t]he Apache Indians, at a long time antedating the acquisition by the United States of the lands ceded as aforesaid by Mexico, occupied and possessed and owned, under the Indian title of occupancy and possession . . . a large area which included that now reserved to them by the establishment of their reservation known as the San Carlos Indian Reservation.

*Id.* ¶ 9.

¶**41**     After establishing a chain of title to the lands of the Apache Tribe, the Amended Complaint asserts that the Tribe's right to water is based on theories of "occupancy and possession":

> These Indians are entitled by their rights of occupancy and possession and on account of the reservations thus made, to sufficient water for the irrigation of the lands deemed necessary for them to irrigate from the Gila River, excluding the San Carlos River, three thousand (3,000) acres of land, which lands are of a good agricultural character and are susceptible of irrigation from said streams and require irrigation to make them capable of producing crops . . . .  The said water rights have a priority, antedating all priorities of white persons and as of the date when the Apache Indians first came to occupy said territory, which was before the United States or Mexico acquired sovereignty thereof, as well as a priority as of the date of said first reservation, which was December 14, 1872.

*Id.* ¶ 9(b).

¶**42**     The Amended Complaint then sets forth a separate claim, based on prior appropriation, with a priority date of between 1873 and 1901:

30

> The Indians of said San Carlos Reservation irrigated with the waters of the Gila River, exclusive of the waters of the San Carlos River, through a number of ditches on their reservation aforesaid, from the year 1873 to the year 1900, and since, beginning with 100 acres and increasing to 2,500 acres of land in the year 1900, and on account thereof the United States is entitled, as a mere appropriator, to 32 second-feet of water, continuous flow, with a limitation of 12,800 acre-feet of water per annum, with priorities as of . . . prior to the year 1901.

*Id.* ¶ 10.

**¶43**        Finally, the Amended Complaint summarizes the water rights the United States is claiming for the Tribe.  It states that the federal government has

> *reserved* and *appropriated*, acquired, and owns, and is entitled to use for said Indian reservations . . . . 37½ second-feet of water with a limitation of 15,000 acre-feet per annum, and 32 second-feet with a yearly limitation of 12,000 acre-feet . . . with priorities, respectively, as of the year 1846, when the United States obtained sovereignty over that territory, as well as of December 14, 1872.

*Id.* ¶ 14, 14(b) (emphasis added).

**¶44**        Contrary to the Tribe's argument, the Amended Complaint establishes that the United States was asserting rights in addition to those based on prior appropriation.  The Amended Complaint describes the Tribe's rights to water both "reserved and appropriated," *id.* ¶ 14, and claims that such rights derive from both "occupancy and possession," *id.* ¶ 9(b). Indeed, because the Amended Complaint asserts a claim to water from 1846, almost thirty years prior to 1873, the first year in

31

which the Tribe is alleged to have begun irrigation, the United States necessarily must have asserted claims under theories in addition to prior appropriation. *Id.* ¶ 14. This is confirmed by the fact that the Amended Complaint claims that the Tribe is entitled to water with two different priority dates, 1846 and 1872. *Id.*

¶45 The Decree also indicates that the Globe Equity litigation adjudicated the totality of the Tribe's water rights in the Gila River mainstem. The Decree's introduction states that

> the plaintiff and the parties defendant . . . have concluded and settled *all issues in this cause* . . . and mutually have agreed . . . that such settlement should be embodied in and confirmed and made effective by way of the within decree of the Court in this cause, defining and adjudicating *their claims and rights* as against each other in identical form and substance as hereinafter set forth[.]

(Emphasis added.) Article XIII then states:

> [A]ll of the parties to whom rights to water are decreed in this cause . . . are hereby forever enjoined and restrained from asserting or claiming--as against any of the parties herein . . . --*any right, title or interest in or to the waters of the Gila River*, or any thereof, except the rights specified, determined and allowed by this decree, and each and all thereof are hereby perpetually restrained and enjoined from diverting, taking or interfering in any way with the waters of the Gila River or any part thereof . . . .

(Emphasis added.) It is difficult to imagine more explicit language indicating that the Decree was intended to resolve all

32

of the parties' claims to the Gila River mainstem.

¶46     Based on the language of the Complaint, the Amended Complaint, and the Decree, we conclude that all of the Tribe's water rights, under all theories, to the Gila River mainstem were placed at issue and resolved in the Globe Equity litigation.   The Decree precludes all further claims to the mainstem of the Gila River by the parties to the Decree.

## IV.

¶47     The United States was a party to the Globe Equity litigation, but the Tribe was not.   We must therefore next determine whether the United States and the Tribe were in privity in the Globe Equity litigation such that the Tribe is bound by the Decree.[15]

¶48     We start from the premise that the United States' representation, as trustee, of a tribe in litigation that results in a judgment or decree ordinarily binds that tribe to the decree.   The Supreme Court so held in 1912, in a case involving the authority of the federal government to represent the Cherokee Nation in litigation instituted for the return of title to certain Indian lands.   *Heckman v. United States,* 224 U.S. 413, 444 (1912).   The Court noted that the "efficacy" of

---

[15]     In June of 1935, before the entry of the Decree, the Pima Indian Tribal Council (now GRIC) petitioned for leave to intervene as a party in the Globe Equity litigation; the district court denied the request.   The Apache Tribe did not seek to intervene before the entry of the Decree.

the litigation "does not depend upon the Indians' acquiescence" in the litigation. *Id.* at 444-45. Rather, because the United States instituted suit on behalf of the Indians, "[i]t was not necessary to make the[] grantors parties, for the government was in court on their behalf." *Id.* at 445. The resulting decree obtained by the Government in the litigation "bind[s] not only the United States, but the Indians whom it represents in the litigation." *Id.* at 445-46.

¶49 Similarly, in *Arizona v. California*, the Supreme Court noted that the "United States' action as [the Tribes'] representative w[ould] bind the Tribes to any judgment" entered in the litigation. 460 U.S. 605, 615 (1983) (citing *Heckman*, 224 U.S. at 444-45). The Court noted that, absent certain specific language included in the decree in that case, "[t]here is no question that if these claims [currently asserted by the Tribe] were presented in a different proceeding, a court would be without power to reopen the matter due to the operation of res judicata." *Id.* at 617.

## A.

¶50 The Tribe nonetheless argues that the United States lacked authority to represent it in the Globe Equity litigation. First, the Tribe asserts that "the United States lacked any authority from Congress to represent the Apache Tribe in [the] Globe Equity [litigation] . . . which would preclude the

34

application of res judicata."

¶51     This argument fails.  In 1893, Congress enacted legislation specifically providing that "[i]n all States and Territories where there are reservations or allotted Indians the United States District Attorney shall represent them in all suits at law and in equity."  Act of Mar. 3, 1893, ch. 209, § 1, 27 Stat. 631 (codified as amended at 25 U.S.C. § 175 (2001)).  Here, the Amended Complaint expressly alleges that the Globe Equity litigation was "instituted at the suggestion of the Secretary of the Interior and by the direction and authority of the Attorney General."  Am. Compl. ¶ 3.  This allegation makes plain that the United States was proceeding pursuant to authority expressly granted by Congress.  *See Heckman*, 224 U.S. at 445-46 ("[I]f the United States . . . is entitled to bring a suit of this character, it must follow that the decree will bind not only the United States, but the Indians whom it represents in the litigation.").

¶52     Second, the Tribe argues that the Decree is "without validity as to the Tribe" because there was no "clear congressional authorization to extinguish Apache Tribal water rights, as required by the federal common law and the Nonintercourse Act, 25 U.S.C. § 177."[16]  In support of this

---

[16]     In relevant portion, the Nonintercourse Act provides that "[n]o purchase, grant, lease, or other conveyance of lands, or

35

argument the Tribe relies primarily on *County of Oneida v. Oneida Indian Nation*, which held that "the Nonintercourse Act[] simply 'put into statutory form what was or came to be the accepted rule—that the extinguishment of Indian title required the consent of the United States.'" 470 U.S. 226, 240 (1985) (quoting *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 678 (1974)).

¶**53** The *Oneida* doctrine has no application here. The Decree served to *determine* the scope of the Tribe's water rights, not to *extinguish* them. The Ninth Circuit expressly recognized this distinction between the definition of tribal rights and the extinguishment thereof in *United States v. Ahtanum Irrigation District* ("*Ahtanum I*"), 236 F.2d 321 (9th Cir. 1956), and *United States v. Ahtanum Irrigation District* ("*Ahtanum II*"), 330 F.2d 897 (9th Cir. 1964). *Ahtanum I* held that the Secretary of the Interior "had the power" to enter into an "arrangement for the apportionment of the Ahtanum waters" under his "general powers of supervision and management" over Indians. 236 F.2d at 338. In *Ahtanum II*, the court clarified that

> it must be plain from our original opinion that if we ha[d] been called upon to uphold the power of the

---

of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution." 25 U.S.C. § 177 (2001).

> Secretary of the Interior *to make a conveyance of the waters of Ahtanum Creek* to these white landowners we would have been confronted with a very serious question indeed—a much more difficult question than that which we decided.

330 F.2d at 903 (emphasis added).

¶54     More recently, in *United States v. Truckee-Carson Irrigation District*, a case involving the Pyramid Lake Paiute Tribe's attack on the 1944 Orr Ditch Decree, the Ninth Circuit affirmed the notion that "[t]he authority to represent the Tribe in litigation must be distinguished from the authority to extinguish tribal property interests." 649 F.2d 1286, 1300 (9th Cir. 1981), *amended by* 666 F.2d 351 (9th Cir. 1982), *aff'd in part and rev'd in part on other grounds sub nom. Nevada v. United States*, 463 U.S. 110 (1983). The court found that section 10 of the Reclamation Act of 1902 did not "confer[] on the Secretary [of the Interior] authority to extinguish the Pyramid Lake Tribe's water rights." *Id.* at 1298. Nonetheless, the court held that "an action to quantify reserved water rights was within the authority conferred by section 10 of the Reclamation Act of 1902." *Id.* at 1300.

¶55     The 1924 Act "[f]or the continuance of construction work on the San Carlos Federal irrigation project in Arizona" contains language nearly identical to that of section 10 of the

37

Reclamation Act of 1902.[17]  Act of June 7, 1924, ch. 288, § 5, 43 Stat. 475, 476.  Thus, while the Government may not have had authority to "extinguish" the Tribe's right to water in the Globe Equity litigation, it possessed the power to "represent [the Tribe's] interests in [the] litigation" in order to "quantify [the Tribe's] reserved water rights."  *Truckee-Carson*, 649 F.2d at 1300.[18]

**B.**

**1.**

¶56    The Tribe next asserts that the United States' representation of the Tribe in the Globe Equity litigation was so inadequate as to prevent the presence of privity between the

---

[17]    Section 10 of the Reclamation Act of 1902 provides:  "[T]he Secretary of the Interior is hereby authorized to perform any and all acts and to make such rules and regulations as may be necessary and proper for the purpose of carrying the provisions of this act into full force and effect."  Reclamation Act of 1902, ch. 1093, § 10, 32 Stat. 388, 390 (codified in scattered sections of 43 U.S.C.).  The 1924 Act provides:  "The Secretary of the Interior is hereby authorized to perform any and all acts and to make such rules and regulations as may be necessary and proper for the purpose of carrying the provisions of this Act into full force and effect[.]"  Act of June 7, 1924, ch. 288, § 5, 43 Stat. 475, 476.

[18]    The Tribe argues in the alternative that the superior court erred "where it failed to conclude that the issue of lack of authority is a disputed genuine issue[] of material fact."  The Tribe, however, identifies no such issue of fact.  Because the United States had statutory authority to represent the Tribe, we affirm the superior court's determination that there are no genuine issues of material fact precluding a grant of summary judgment against the Tribe on this issue.

Tribe and the Government.[19]  The Tribe relies on § 42(1)(e) of the Second Restatement, which provides, in relevant part, as follows:

> (1) A person is not bound by a judgment for or against a party who purports to represent him if:
>         . . . .
>         (e) The representative failed to prosecute or defend the action with due diligence and reasonable prudence, and the opposing party was on notice of facts making that failure apparent.

The Tribe contends that, in the Globe Equity litigation, the Government ignored the Tribe's substantial rights to Gila River water under the *Winters* doctrine, prosecuted the case while under an actual conflict of interest, and staffed the case with attorneys biased against the Tribe.  Moreover, the Tribe alleges that "[t]he United States' representation of the Tribe was so grossly deficient as to provide notice to the opposing parties of this fact, and to create no legitimate claim of justifiable reliance by them."

**¶57**      We begin by assuming, without deciding, that the United States' representation of the Tribe in the Globe Equity litigation produced less than desirable results for the Tribe. However, our job in this case is not to re-evaluate the litigation skills and strategies of the Government's attorneys seventy years after their efforts resulted in the entry of the

---

[19]    While the United States does not agree that it provided the Tribe with inadequate representation, it supports the Tribe's request for an evidentiary hearing on the claim.

Decree.  Rather, we must apply federal law, giving the Decree the same preclusive effects as would the federal courts.  *Cf. Locklin v. Switzer Bros., Inc.*, 335 F.2d 331, 334 (7th Cir. 1964) ("[A] 'foreign' federal court will not set aside a judgment, in an independent equitable action, unless the judgment would be set aside on those same grounds by the 'home' federal court.") (citing *Bros. Inc. v. W.E. Grace Mfg. Co.*, 320 F.2d 594, 607 (5th Cir. 1963)).  Thus, we must determine what preclusive effect the United States District Court for the District of Arizona would provide the Decree.

¶58     Our role is analogous to that of a federal court applying state court preclusion principles to a previous state court judgment.  *See* U.S. Const. art. IV, § 1; 28 U.S.C. § 1738 (1994); *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985) ("'It has long been established that § 1738 does not allow federal courts to employ their own rules of res judicata in determining the effect of state judgments.  Rather, it goes beyond the common law and commands a federal court to accept the rules chosen by the State from which the judgment is taken.'") (quoting *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 481-82 (1982)).  As the Second Restatement points out, "[i]t has long been established that the judgments of the federal courts are to be accorded full faith and credit when a question of their recognition arises in a state court or in another federal

40

court."  Second Restatement § 87 cmt. a.

## 2.

¶59    The Supreme Court has never expressly held that the Government's representation of a tribe can be so inadequate as to remove privity.  The Court, however, has twice rejected similar arguments in cases analogous to this one.  In *Arizona v. California*, the Court held that the Government's concurrent representation of five tribes in litigation involving the Colorado River did not "authorize relitigation of their reserved rights."  460 U.S. at 626.  The Court held that

> [a] breach of the United States' duty to represent the
> Tribes' interests is not demonstrated merely by
> showing that the government erred in its calculation
> of irrigable acreage, whether by an oversight or, as
> viewed in retrospect, by an unnecessarily cautious
> litigation strategy . . . .  [A] claim of inadequate
> representation cannot be supported on this record.

*Id.* at 628 n.21.

¶60    The Court reached a similar result in *Nevada*, holding that the Paiute Tribe was bound by the Government's representation in the Orr Ditch litigation:

> This Court left little room for an argument to the
> contrary in *Heckman v. United States*, where it plainly
> said that "it could not, consistently with any
> principle, be tolerated that, after the United States
> on behalf of its wards had invoked the jurisdiction of
> its courts . . . these wards should themselves be
> permitted to relitigate the question."  We reaffirm
> that principle now.

41

463 U.S. at 135 (internal citations omitted, alteration in original).

¶61    The Tribe argues that this case is factually distinguishable from the Supreme Court precedents and that the Court would apply § 42(1)(e) of the Second Restatement and find an absence of privity with respect to the Globe Equity Decree. We need not today resolve that issue, however, because we conclude that the doctrine of comity compels us to refrain from addressing the Tribe's arguments.

**3.**

¶62    Ordinarily, relief from a judgment "must be obtained by means of a motion for that purpose in the court that rendered the judgment unless relief may be obtained more fully, conveniently, or appropriately by some other procedure." Second Restatement § 78. In the federal courts, such a motion is governed by Federal Rule of Civil Procedure 60(b).[20] Consent

---

[20]    Rule 60(b) provides:

Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, Etc. On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the

42

decrees are subject to the requirements of Rule 60(b). *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378 (1992).

¶63    Under Rule 60(b), a court may also "entertain an independent action to relieve a party from a judgment . . . ." As a general matter, that action "may or may not be begun in the court which rendered the judgment." Fed. R. Civ. P. 60(b) advisory committee's note (1946 Amendment, Subdivision (b)); *see also Locklin*, 335 F.2d at 334 (stating that an "independent equitable action may be maintained in any court exercising equitable jurisdiction").

¶64    However, even if Rule 60(b) facially grants us the power to consider the Tribe's privity arguments in an

_____

judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken. A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation. This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to grant relief to a defendant not actually personally notified as provided in Title 28, U.S.C., § 1655, or to set aside a judgment for fraud upon the court. Writs of coram nobis, coram vobis, audita querela, and bills of review and bills in the nature of a bill of review, are abolished, and the procedure for obtaining any relief from a judgment shall be by motion as prescribed in these rules or by an independent action.

"independent" attack on the Decree, the doctrine of comity counsels to the contrary. "The principle [of comity] is that a court should not assume to disturb another court's disposition of a controversy unless there are good reasons for doing so." Second Restatement § 78 cmt. a.

¶65     *Lapin v. Shulton, Inc.*, 333 F.2d 169 (9th Cir. 1964), illustrates the application of the comity doctrine. In that case, the Ninth Circuit affirmed a district court's refusal to entertain an action challenging an injunction issued by the United States District Court for the District of Minnesota on the grounds "that changed circumstances had rendered inequitable the prospective application of the decree." *Id.* at 170. The court held that

> for a nonissuing court to entertain an action for such relief would be seriously to interfere with, and substantially to usurp, the inherent power of the issuing court . . . to supervise its continuing decree by determining from time to time whether and how the decree should be supplemented, modified or discontinued in order properly to adapt it to new or changing circumstances.

*Id.* at 172. The Ninth Circuit found that it "need not go so far as to hold that these considerations and this interpretation of Rule 60(b) deprive all courts other than the issuing court of jurisdiction in such a case as this." *Id.* Nonetheless, "considerations of comity and [the] orderly administration of justice demand that the nonrendering court should decline

44

jurisdiction of such an action and remand the parties for their relief to the rendering court, so long as it is apparent that a remedy is available there." *Id.*

¶66	Similarly, in *Treadaway v. Academy of Motion Picture Arts & Sciences*, the Ninth Circuit, following *Lapin*, held that a district court could "refuse entirely to entertain [an] action if relief in a more appropriate forum—the rendering court—were available."  783 F.2d 1418, 1421 (9th Cir. 1986) (footnote omitted).  In that case, the plaintiff brought an independent action under Rule 60(b) in a district court challenging a bankruptcy court's sale of certain films, photographs, and scripts.  *Id.* at 1419-20.  In affirming the district court's refusal to consider the action, the Ninth Circuit confirmed that *Lapin* "was germane to independent attacks on all types of final judgments."  *Id.* at 1422.  The court emphasized that "[w]hen a court entertains an independent action for relief from the final order of another court, it interferes with and usurps the power of the rendering court just as much as it would if it were reviewing that court's equitable decree."  *Id.*

¶67	Because "discretion requires a [federal] district court to decline to hear a claim seeking relief from a judgment entered by a coordinate court, at least when it is apparent that the parties can seek redress in the issuing court," *Feller v. Brock*, 802 F.2d 722, 728 (4th Cir. 1986), this Court should

45

ordinarily decline to entertain an independent action challenging the validity of a federal decree. Such comity to the federal courts is particularly appropriate here.

¶68    The issuing federal court – the United States District Court for the District of Arizona – expressly retained jurisdiction over the interpretation and enforcement of the Decree in 1935. That court continues to actively "review the actions of the Water Commissioner and to enforce the Decree." *United States v. Gila Valley Irrigation Dist.* ("*GVID III*"), 961 F.2d 1432, 1434 (9th Cir. 1992). The Tribe is a party to the federal litigation, having been granted permission to intervene in 1990.

¶69    In its motion to intervene, the Tribe made clear that none of the allegations in its complaint in intervention sought "to vacate the Decree, or re-litigate issues." Thus, in federal court, the Tribe has declared that it "does not seek to litigate rights to additional Gila River water in this matter, and [that] no allegations have been made in the proposed Complaint in Intervention regarding *Winters* water rights."

¶70    The limited nature of the Tribe's intervention in the federal litigation does not, of course, establish its acquiescence in the Decree's validity. It is clear, however, that the Tribe has consciously declined to adjudicate its "inadequate representation" claim in the forum responsible for

46

issuing, interpreting, and enforcing the Decree. Notions of comity would be seriously undermined if we were to permit the Tribe to assert the very arguments in this Court that it has explicitly pretermitted in the federal court.

¶71 The Tribe presumably moved to intervene in the federal litigation only for limited purposes because the district court had already intimated its view of a tribe's ability to challenge both the validity of the Decree and the adequacy of the United States' representation in the Globe Equity litigation. In 1983, GRIC "successfully moved to intervene as a plaintiff" in the federal litigation interpreting the Decree. *GVID III*, 961 F.2d at 1434. In granting GRIC's motion, however, the district court prohibited GRIC from intervening "for the purpose of vacating the Decree or relitigating the issues resolved by the Decree." The court noted that GRIC's motion to intervene was filed forty-seven years after the entry of the Decree:

> To the extent GRIC seeks to vacate the Decree or to relitigate the issues the Decree resolves, it is hard to imagine a more untimely motion. The prejudice to the parties that is posed by GRIC's avowed intent at this late date to dismantle the Decree is manifest. Water is lifeblood to the land affected by the Decree and the Decree apportions much of the available water. To permit an attack now on the Decree would cast the apportionment of Gila River water into a legal limbo, perhaps of many years duration, that would be detrimental to the interests of all the parties to the Decree.

In addition, the district court expressly refused to consider

47

GRIC's argument that the United States' representation of GRIC in the Globe Equity litigation had been inadequate, stating that it was "too late in the day for GRIC now to complain of its representation back in 1935." GRIC's intervention was thus made "subject to the condition that any complaint that GRIC files in the action must seek only to enforce the Decree and not to vacate the Decree or to relitigate issues already determined by the Decree."

¶72 The Tribe argues that the district court's 1983 ruling with respect to GRIC's intervention establishes that the Tribe cannot obtain relief in the court that issued the Decree, and therefore the Tribe should be allowed to pursue such relief here. But we take precisely the opposite message from the 1983 ruling. Our task, after all, is to accord the Decree the same preclusive effect as would the issuing federal court. The 1983 ruling tells us that the issuing court would not entertain an attack on the Decree, despite its facial power under Rule 60(b) to do so, because of untimeliness. Comity requires that we respect that determination; a contrary determination would reward a party who had waited too long to attack a judgment in federal court by providing a state forum.

¶73 Had the Tribe believed that the district court erred in refusing to allow GRIC to intervene to attack the Decree, it could have sought to attack the Decree in its 1990 motion to

48

intervene and then sought federal appellate review from any denial thereof. Had it done so, the federal courts could have conclusively addressed the issue. If we were today to consider the Tribe's privity arguments, we would be in effect rewarding its strategic choice to withhold making those arguments in the court that issued the Decree in order to seek a more favorable forum here. The doctrine of comity requires a different result.[21] We therefore decline to consider the Tribe's attack on the Decree on the basis of absence of privity.[22]

**V.**

¶74       Phelps Dodge, SRP, and Safford, none of whom were parties to the 1935 Decree (the "Nonparties"), argue that they should nonetheless be able to assert the preclusive effect of the Decree against the Tribe and the United States. Ordinarily

---

[21]     We express no opinion as to what other remedies, if any, might be available to the Tribe for the Government's allegedly inadequate representation. *See Arizona v. California*, 460 U.S. at 628 n.20 (noting that "in an appropriate case the Tribes' remedy for inadequate representation by the government may lie in the Court of Claims").

[22]     Arizona law requires that "when rights to the use of water or dates of appropriation have previously been determined in a prior decree of a court, the court *shall accept* the determination of such rights and dates of appropriation as found in the prior decree . . . ." A.R.S. § 45-257(B)(1) (emphasis added). Given our conclusion as a matter of federal law that the doctrine of comity prevents us from considering the Tribe's argument that the Decree should not be enforceable against it because of the absence of privity, we need not consider today whether § 45-257(B)(1) also requires the same result as a matter of state law.

49

the application of claim preclusion requires "mutuality" – both the party asserting the preclusive effect of a prior judgment and the party against whom preclusion is asserted must have been parties in the prior litigation. *Nevada*, 463 U.S. at 143. In certain circumstances, however, "exceptions to the *res judicata* mutuality requirement have been found necessary . . . ." *Id.* The Supreme Court established such an exception in *Nevada*, holding that the Orr Ditch litigation was "a comprehensive adjudication of water rights intended to settle once and for all the question of how much of the Truckee River each of the litigants was entitled to." *Id.* Because of the scope of the litigation, "[n]onparties [including] subsequent appropriators . . . have relied just as much on the *Orr Ditch* decree in participating in the development of western Nevada as have the parties to that case." *Id.* at 144. Under those circumstances, the Court recognized a limited exception to the requirement of mutuality for claim preclusion, enabling those later appropriators to assert the preclusive effect of the decree against parties to the decree.

¶75    In this case, the Nonparties argue that the Globe Equity litigation was sufficiently comprehensive to qualify for the *Nevada* mutuality exception; they also claim that they have relied on the Decree in the same manner as did the later appropriators in *Nevada* and should be able to use the Decree's

preclusive effect against parties to the Decree.[23]   In opposition, the Tribe and the United States argue that because the United States "expressly limited the Globe Equity proceedings to a defined segment of the Gila River exclusive of tributaries," the Globe Equity litigation was not sufficiently "comprehensive" to qualify for the mutuality exception outlined in *Nevada*.[24]   In addition, the United States argues that because the Decree grants "compromise" rights in addition to establishing priorities under the doctrine of prior appropriation, subsequent appropriators would not be justified in relying on the Decree when appropriating water, and are therefore not entitled to assert the preclusive effect of the Decree.

¶76     We have concluded above that the Decree was intended to resolve all claims to the Gila River mainstem.  The United States included as defendants in the Globe Equity litigation all those with claims to the mainstem of the Gila River, and the Decree includes all water rights theories that the parties could have asserted.  Thus, as to the mainstem of the Gila River, the

---

[23]    As parties to the Decree, or successors in interest to parties to the Decree, ASARCO, GVID, FID, and SCIDD are entitled to assert the preclusive effect of the Decree and need not rely on the *Nevada* mutuality exception to claim preclusion.

[24]    GRIC joins the Tribe and the United States in this argument, but focuses its brief on refuting the ability of Phelps Dodge in particular to assert the preclusive effects of the Decree.

51

Decree is comprehensive.  In addition, given the long history of the Decree, it is clear that those not party to the Decree have in fact relied upon it in the same manner as the later appropriators in *Nevada*.  With respect to the Gila River mainstem, the *Nevada* exception to mutuality applies and those who were not party to the Decree are entitled to assert its preclusive effects against parties to the Decree and their successors.

¶77        None of the Nonparties, however, seek to assert the preclusive effect of the Decree as to the Gila River mainstem. Rather, the Nonparties claim that under the *Nevada* mutuality exception they are entitled to assert the preclusive effect of the Decree as to waters of the Gila River *tributaries*.  Because we have determined that the Decree itself precludes only additional claims to the mainstem, any assertion of preclusive effect by the Nonparties with respect to waters of the tributaries fails.

**VI.**

¶78        The Gila River general stream adjudication consists of a series of cases organized by watershed and by petitioner.  The case we today consider, denominated W1-206, involves claims by the Apache Tribe and the United States on the Tribe's behalf. Case W1-203 involves claims by GRIC and the United States on GRIC's behalf.

52

¶79    Before issuing its order in this case, the superior court considered similar summary judgment motions in W1-203. On March 7, 2002, the superior court issued an order in W1-203, granting summary judgment to those parties who had filed motions arguing that the Decree precluded GRIC or the United States on GRIC's behalf from asserting additional claims for water in the Gila River. The court concluded that "neither GRIC nor the United States on behalf of GRIC shall be entitled to claim water rights relating to the mainstem of the Gila River . . . except to the extent such rights were granted to them by the *Globe Equity Decree*."

¶80    When it issued its May 17, 2002 order in case W1-206, the superior court stated that it "ha[d] considered all filed memoranda and arguments of counsel and ha[d] otherwise become fully advised as to the issues presented." The court then

> [g]rant[ed] the motions for summary judgment filed by GRIC, SCAT, Safford, GVID and FID jointly, SCIDD, Phelps Dodge, and ASARCO to the extent that these motions seek a determination that preclusive effect of the *Globe Equity Decree* is applicable to the parties consistent with the findings and conclusions set forth in this court's Amended Order . . . that was entered in contested case No. W1-203.

¶81    The Apache Tribe argues that the superior court "committed clear error by adopting the findings and conclusions in the Amended Order in W1-203 for GRIC as the sole basis for granting summary judgment against the Tribe in W1-206."

53

According to the Tribe, a determination of the preclusiveness of the Decree required "**separate** examination of the unique factual history involving these two very different Indian Tribes . . . and . . . separate consideration of the different legal arguments made by the Tribe and GRIC on summary judgment . . . ."

¶82       We have today determined the preclusive effects of the Decree as a matter of law based on our interpretation of the Decree and the filings in the Globe Equity litigation leading to the Decree.  This legal determination of the Decree's preclusive effects makes any factual differences between cases W1-203 and W1-206 irrelevant.  Because our opinion does not rely upon any factual determinations, but rather only on the record in the Globe Equity litigation, the Tribe's arguments about the form of the order below do not affect our conclusions.[25]

## VII.

¶83       In summary, for the reasons stated above, we hold that the Globe Equity Decree precludes the Apache Tribe and the United States on the Tribe's behalf from asserting claims to

---

[25]    One of the issues on which we granted review was whether the superior court erred in failing to determine that the Decree or the Landowners' Agreements of 1924 specifically preclude GRIC and the United States on behalf of GRIC from claiming any rights to the San Carlos River in the Gila River general stream adjudication.  *See supra* note 5.  Because this issue would be more appropriately addressed in any review of the summary judgment order in W1-203 by GRIC, we vacate our order granting review of this issue as improvidently granted.

water from the mainstem of the Gila River beyond those rights granted in the Decree, but that it does not preclude claims to the tributaries of the Gila River. (Tribe's issue 1.) This holding also addresses the single issue raised by Phelps Dodge in its cross-appeal. We hold that the superior court's reference in case W1-206 to its order in W1-203 was not reversible error. (Tribe's issue 2.) We decline on grounds of comity to address the Tribe's argument that the Decree is not entitled to preclusive effect because of an absence of privity. (Tribe's issue 3.) We hold that the Government was vested with the authority to represent the Tribe in the Globe Equity litigation and to litigate the extent of the Tribe's water rights. (Tribe's issue 4.) We vacate our order granting interlocutory review of the effect of the Landowners' Agreements on any claims by GRIC to the San Carlos River. (Tribe's issue 5.) We hold that the *Nevada* exception allows non-parties to the Decree to assert its preclusive effect, but only as to waters in the Gila River mainstem. (Tribe's issue 6.)

¶84        The May 17, 2002 order of the superior court is therefore affirmed to the extent that it holds that the Decree has preclusive effect with respect to claims by the Tribe and the United States to waters in the Gila River mainstem. The order is also affirmed to the extent that it concludes that the Decree has no preclusive effect with respect to the tributaries

55

of the Gila River.  This case is remanded to the superior court for further proceedings consistent with this opinion.


_____
Andrew D. Hurwitz, Justice


CONCURRING:


_____
Ruth V. McGregor, Chief Justice


_____
Rebecca White Berch, Vice Chief Justice


_____
Michael D. Ryan, Justice


_____
A. John Pelander, Judge[*]

---

[*]   Pursuant to Article 6, Section 3 of the Arizona Constitution, the Honorable A. John Pelander, Chief Judge of the Arizona Court of Appeals, Division Two, was designated to sit in this matter.