SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| IN RE THE GENERAL ADJUDICATION OF ALL RIGHTS TO USE WATER IN THE GILA RIVER SYSTEM AND SOURCE | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Arizona Supreme Court No. WC-07-0002-IR<br><br>Maricopa County Superior Court No. W-1<br>    W-2<br>    W-3<br>    W-4<br>(Consolidated Cases)<br><br>Contested Case No. W1-208<br><br>**O P I N I O N** |

Interlocutory Appeal from the Superior Court in Maricopa County
The Honorable Eddward Ballinger, Jr., Judge

**Affirmed**

_____

SACKS TIERNEY, P.A.                                    Scottsdale
    By   Judith M. Dworkin
         Marvin S. Cohen
Attorneys for City of Tucson

SOMACH SIMMONS & DUNN                            Paradise Valley
    By   Robert B. Hoffman
Attorneys for Farmers Investment Co.
and Farmers Water Co. (FICO)

THE SPARKS LAW FIRM, P.C.                               Scottsdale
    By   Joe P. Sparks
         Susan B. Montgomery
         Robyn L. Interpreter
Attorneys for Pascua Yaqui Tribe and Intervenors
San Carlos Apache Tribe, Yavapai-Apache Nation and
Tonto Apache Tribe

JONATHAN L. JANTZEN, TOHONO O'ODHAM NATION              Sells
ACTING ATTORNEY GENERAL
    By   Jonathan L. Jantzen, Acting Attorney General
Attorneys for Tohono O'Odham Nation

1

RONALD J. TENPAS, ACTING ASSISTANT                    Washington, DC
UNITED STATES ATTORNEY GENERAL
MICHAEL B. MUKASEY,
UNITED STATES ATTORNEY GENERAL
        By   John L. Smeltzer
             F. Patrick Barry
Attorneys for the Department of Justice,
United States of America

RYLEY CARLOCK & APPLEWHITE, P.A.                            Phoenix
        By   L. William Staudenmaier, III
Attorneys for Arizona Public Service Company

SALMON LEWIS & WELDON, P.L.C.                              Phoenix
        By   John B. Weldon, Jr.
             Lisa M. McKnight
Attorneys for Salt River Valley Water Users' Association
and Salt River Project Agricultural Improvement and
Power District

Jennifer K. Giff                                          Sacaton

And

Rodney B. Lewis                                           Sacaton

And

John T. Hestand                                          Chandler
Timothy L. Pierson
Ruth E. Koester
Ann Marie Chischilly

And

AKIN GUMP STRAUSS HAUER & FELD, L.L.P.            Washington, DC
        By   Donald R. Pongrace
Attorneys for Gila River Indian Community
_____

**R Y A N**, Justice

**I**

**A**

¶1      This case arises from the ongoing adjudication of rights to the use of Gila River water and the impact of recent federal legislation facilitating the resolution of tribal water claims subject to the adjudication.[1]

¶2      In 2004, Congress passed the Arizona Water Settlements Act ("AWSA"), Pub. L. No. 108-451, 118 Stat. 3478 (2004). Title III of the AWSA authorizes the settlement of the federal water rights claims of the Tohono O'odham Nation ("Nation").[2] Under

---

[1]      For an outline of the facts and procedural history of this ongoing adjudication, see *In re the General Adjudication of All Rights to Use Water in the Gila River System and Source*, 195 Ariz. 411, 414, ¶ 5, 989 P.2d 739, 742 (1999) ("*Gila River III*"); *San Carlos Apache Tribe v. Superior Court ex rel. County of Maricopa*, 193 Ariz. 195, 202, ¶ 3, 972 P.2d 179, 186 (1999); *In re Rights to the Use of the Gila River,* 171 Ariz. 230, 232-33, 830 P.2d 442, 444-45 (1992) ("*Gila River I*").

[2]      The Arizona Department of Water Resources' *Technical Assessment of the Tohono O'odham Nation Water Rights Settlement*, ("assessment") describes the geographic scope of the agreement as follows:

> The Settlement Agreement encompasses only those lands of the Nation that are within the "Tucson Management Area," which is a geographic area comprised of the Tucson Active Management Area . . . , the Santa Cruz Active Management Area, and that portion of the Upper Santa Cruz Basin not within either of the Active Management Areas. Included within the Tucson Management Area are the entire San Xavier Reservation and the eastern portion of the Schuk Toak District of the Sells Papago Reservation.

the auspices of the AWSA, the Nation, the United States, the City of Tucson, Farmers Investment Company ("FICO"), and ASARCO, Inc. ("the settling parties") sought entry of judgment confirming a settlement agreement among them. Under the settlement agreement, the Nation agreed to give up its claim to federally reserved groundwater rights on the Nation's reservation in return for commitments from the United States to provide Colorado River water through the Central Arizona Project ("CAP"), and agreements from the City of Tucson, FICO, and ASARCO to limit groundwater pumping and compensate the Nation for injuries caused by pumping.

¶3        The AWSA is part of a broader effort by federal, state, and tribal entities to resolve water rights issues. As such, the AWSA contemplates more than the settlement agreement. For example, encouraged by Congress, the Arizona Legislature adopted legislation designed to protect groundwater in and

---

Assessment at 1-1 to 1-2, *available at* http://www.azwater.gov/ dwr/content/Hot_Topics/AZ_Water_Settlements/SAWRSA/TohonoOodham NationWaterRightsSettlement.pdf.        Both the San Xavier Reservation and the Schuk Toak District are part of the Nation's lands. *Id*. These two areas comprise all of the Nation's lands within the upper basin of the Santa Cruz River, a Gila River Tributary. The Tucson Management Area is defined in the AWSA to mean the Tucson Active Management Area, the Santa Cruz Active Management Area, and that part of the upper Santa Cruz River Basin not within either management area. AWSA § 303(48). An Active Management Area is a geographic area designated under the Arizona Groundwater Code as requiring active groundwater management. *See* Ariz. Rev. Stat. ("A.R.S.") §§ 45-411, -411.02, -411.03 (2003).

4

around the San Xavier Reservation near Tucson.  *See* 2005 Ariz. Sess. Laws, ch. 143 (1st Reg. Sess.) (codified at A.R.S. §§ 45-2701 to -2702, 45-2711 to -2712 (Supp. 2007)) ("Groundwater Protection Program").  Thus, the AWSA recognizes a comprehensive effort to both satisfy the Nation's claims and protect water resources.

¶4      The timeliness of judicial approval and entry of judgment, however, is critical.  For Title III of the AWSA to take effect, the Secretary of the Interior must publish certain findings by December 31, 2007, including that "the judgment and decree attached to the Tohono O'odham settlement agreement . . . has been approved by the [s]tate court having jurisdiction over the Gila River adjudication proceedings, and that judgment and decree have become final and nonappealable."  AWSA § 302(b)(5), (c).  Likewise, in order for the Arizona legislation to become effective, the same finding must be made.  2005 Ariz. Sess. Laws, ch. 143, § 15 (requiring finding on or before December 31, 2010).

**B**

¶5      The settling parties filed an application for approval of the Tohono O'odham Nation settlement with the Gila River adjudication court in July 2006.  The adjudication court then requested that the Arizona Department of Water Resources ("ADWR") prepare a factual and technical assessment of the

proposed settlement. In October 2006, ADWR submitted its assessment.

**¶6** The Pascua Yaqui Tribe ("Tribe")[3] filed objections to the judgment and decree in December 2006. A hearing on the objections took place in April 2007. In June 2007, the adjudication court summarily disposed of the Tribe's objections. The court denied the Tribe's motion for reconsideration in July 2007 and entered the judgment and decree along with a separate order detailing its reasoning.

**¶7** Following the adjudication court's rejection of the Tribe's objections, both the settling parties and the Tribe sought interlocutory review in this Court. *See* Special Procedural Order providing for Interlocutory Appeals and Certifications (Sept. 26, 1989) ("Interlocutory Appeals Order"). Because of the time constraints imposed by the AWSA, this Court set an expedited briefing schedule and held oral argument on November 20, 2007.

**¶8** In accordance with §§ (B)(3) and (B)(4) of the Interlocutory Appeals Order, we accept interlocutory review of this case because it is in the interest of justice and will save time, expense, and resources. We have jurisdiction under Article 6, Section 5(3) of the Arizona Constitution.

---

[3] The Tribe's reservation borders the north side of the San Xavier Reservation.

6

¶9      Recognizing the importance of facilitating the resolution of tribal claims, on May 16, 1991, this Court issued a Special Procedural Order providing for the Approval of Federal Water Rights Settlements, Including Those of Indian Tribes ("Special Order" or "Special Procedural Order").

¶10     The Special Order does four things.  First, it establishes the circumstances under which special settlement proceedings can be initiated.  Special Order § (A)(1)-(5).  Second, it sets forth the process by which parties may apply to the court to initiate the special proceedings and certain notices that must issue.  *Id*. §§ (B)(1)-(3), (E)(1)-(3).  Third, the Special Order allows other claimants to object to court approval of the settlement.  *Id.* § (C)(1)-(4).  Fourth, the Special Order provides for resolution of objections and approval of the settlement by the adjudication court.  *Id*. § (D)(1)-(7).

¶11     Through the Special Order, this Court sought to balance the rights of Indian tribes to seek settlement of their claims against the rights of other claimants.  Accordingly, the Special Order provides claimants[4] with the opportunity to object

---

[4]     The parties dispute whether the Tribe is properly a claimant and, thus, whether it has "standing," under the terms of the Special Order, to object to the settlement agreement and judgment and decree.  The adjudication court expressed "serious

if the settlement "would cause material injury to the objector's claimed water right," the conditions for approval of such a settlement have not been met, or when "the water rights established in the settlement agreement . . . are more extensive than the Indian tribe . . . would have been able to establish at trial." *Id.* § (C)(1)(a)-(c).

¶12    The Special Order further provides that after resolution of objections, the adjudication court shall approve a settlement if there is a reasonable basis to conclude that the water rights of the settling Indian tribe are no more extensive than would be proved at trial, the objector is not bound by the settlement and may pursue its own remedies against the settling tribe, and the settlement agreement has been reached in good faith. *Id.* § (D)(6)(a)-(c).

¶13    The balance struck by the Special Order seeks to prevent any tribe from using a settlement to gain additional rights to water while protecting other parties whose own rights would be injured by the settlement. At the same time, the

doubt" about "whether the [] Tribe can be properly considered a claimant . . . ." Minute Entry, June 4, 2007, at 2. Nevertheless, the court ruled that "[e]ven if the [] Tribe is viewed as having standing to object, the Court must grant summary disposition . . . because the Proposed Settlement Agreement and proposed judgment cannot be used to affect the [] Tribe's water rights, claims, or entitlements to water." *Id.* Without deciding this issue, we assume for purposes of this opinion that the Tribe can act as a claimant.

8

Special Order provides for judicial approval when the settling tribe has taken steps to preserve other claimants' rights and remedies. Put simply, the expectation under the Special Order is that a settlement will be approved if the settling tribe is no better off than it would be after the final adjudication of all claims, and the settlement preserves the remedies of the non-settling claimants. To prevent approval, an objecting party must show that its claimed water right would suffer "material injury."

¶14    The Tribe did not object to the settlement below on the grounds that the Nation received rights to more water than those to which it is entitled. Rather, the Tribe claimed that the settlement agreement causes material injury to its rights.[5] The adjudication court rejected the objections, holding that the Tribe "stands in the same position whether or not the Proposed Settlement Agreement is approved . . . ." Minute Entry, June 4, 2007, at 2. The Tribe appeals on numerous grounds. However, because the settlement determines only the water rights of the Nation, does not provide the Nation with any federal reserved rights, restricts the amounts of groundwater the Nation may

---

[5]    Although the Tribe did object that the conditions required by this Court to initiate the proceedings had not been met, its argument that the adjudication court erred in dismissing that objection is waived. *See Webster v. Culbertson*, 158 Ariz. 159, 163, 761 P.2d 1063, 1067 (1988) (issue not raised in opening brief is waived).

9

pump, and expressly reserves all rights and claims of the Tribe, we conclude that none of the Tribe's claims has merit.

### III

### A

**¶15** The Tribe first argues that, notwithstanding the Special Order limiting the adjudication court to the consideration of "material injuries," the adjudication court has an "inherent duty" to consider any arguments challenging the legality and constitutionality of the settlement agreement, regardless of whether an objector shows a material injury.[6]

---

[6] The San Carlos Apache Tribe, Yavapai-Apache Nation, and Tonto Apache Tribe ("the Apache Tribes") join the Tribe's argument here because the adjudication court relied on its order in Contested Case No. W1-207, the Gila River settlement, in which it stated that the Special Order "limits [the court's] inquiry in connection with considering approval of the Settlement Agreement to the matters explicitly set forth in the Order." *See* Minute Entry, January 23, 2007. In this proceeding (W1-208), the adjudication court issued an order stating that the "limitations" in the Special Order, as previously determined in W1-207, would "restrict the Court's inquiry in connection with considering approval of the [Nation's] . . . Settlement." Minute Entry, March 20, 2007.

The Apache Tribes and the Lower Gila River Water Users had previously filed a petition for interlocutory review in W1-207. This Court has not acted on that petition. The adjudication court entered a judgment and decree on September 13, 2007, approving the Gila River settlement.

Because the Apache Tribes' objection to the adjudication court's interpretation of the Special Order mirrors the one raised here, they sought and were granted leave to intervene. Likewise, because the issue in W1-208 is the same as the one in W1-207, the Gila River Indian Community and the Salt River Project were

¶16     Indeed, the Tribe raised numerous objections to the legality and constitutionality of the settlement agreement.[7]  The Tribe, however, concedes that these arguments are separate from any objection based on material injury caused by the agreement. Thus, the Tribe asks us to hold that the Special Order is invalid insofar as it limits the adjudication court's obligation to consider objections that do not turn on the settlement agreement itself.[8]

¶17     The "constitutional" objections raised by the Tribe are issues of law, some of which involve separate parties altogether.  For example, the Tribe challenges the Groundwater Protection Program and the Secretary of the Interior's negotiation of CAP contracts, issues well outside the adjudication court's purview.  As the adjudication court found, these arguments do not depend on the settlement agreement and fall outside the "narrow scope of . . . review . . . mandated by

permitted to intervene and file briefs supporting the adjudication court's resolution of this issue.

[7]     These included whether the Groundwater Protection Program improperly delegated authority to the Nation and whether subsequent modifications of the Tribe's own contract with the Secretary for the delivery of CAP water violated the state and federal constitutions.

[8]     To the extent that our order in the separate Little Colorado Adjudication differs from the instant Special Order, we decline to revisit the Special Order, now midway through its second decade in effect.  Because the scope of the Little

11

the [Special Order]." *See id.* They can be addressed at a later date without any injury to the Tribe from delay.

**¶18**        Moreover, the Tribe's constitutional challenge to the Groundwater Protection Program misconstrues its legal effect. The program sets technical standards for defining when non-exempt wells may be drilled in a narrow perimeter around the Nation's lands and directs ADWR to enforce those standards.[9] *See* A.R.S. § 45-2711.   Although the Nation may object to ADWR's decision to permit new wells in the area encompassed by the settlement agreement, it cannot veto ADWR's decision to permit new wells.   *Id.* § 45-2712.   Moreover, the program enacts standards where none were present before, as the State Groundwater Code does not otherwise apply to Indian reservations.   Therefore, the Tribe has suffered no injury because of the adoption of the program.

**¶19**        Contrary to the Tribe's assertion, the Groundwater Protection Program does not "invade[] the exclusive province of the Court . . . to adjudicate and protect the [Tribe's water rights]."     Because the settlement agreement, in compliance with § D(6)(b) of the Special Order, does not bind the Tribe, if

---

Colorado Adjudication's order is not before us, we do not speak to its provisions.
[9]    Wells that pump fewer than thirty-five gallons per minute and are used for limited purposes are exempt from the permitting requirements.  A.R.S. § 45-454.

the adjudication court determines that new wells permitted under the Groundwater Protection Program would harm the Tribe's federal reserved groundwater rights, the court can grant appropriate relief. *See* A.R.S. § 45-2702.

¶20    The Tribe's constitutional claims with respect to its CAP contract are founded on a belief that the settlement would impermissibly impair its contract rights. These claims are meritless. Title I of the AWSA provides that pre-existing agreements or rights to the use of Colorado River water are not affected. AWSA § 108. If the United States should at some future point breach its contract with the Tribe, the Tribe is of course free at that time to seek an appropriate remedy.

**B**

¶21    The Tribe next contends that the adjudication court unconstitutionally prevented it from proving material harm in the proceedings below. The essence of the Tribe's argument is that the settlement agreement materially injures the Tribe's water rights, specifically its groundwater rights and its surface water rights under federal law, and "deplete[s] and deprive[s] the Tribe of its federal reserved water rights," violating the Tribe's due process rights.

¶22    This argument fails for several reasons. First, because the settlement is not binding on the Tribe, it remains free to assert its rights against the settling parties and

13

others. In compliance with the Special Order, the Nation's settlement prohibits the agreement from being interpreted to affect the rights of any other claimant. Special Order § (D)(6)(b). Indeed, the AWSA requires the same. AWSA § 305(e) ("Nothing in this section authorizes the Secretary to acquire or otherwise affect the water rights of any Indian Tribe."). Such claimants retain all remedies available before approval of the settlement necessary to protect their rights in the general adjudication. Thus, the settlement agreement and judgment and decree do not and, indeed, cannot affect the Tribe's rights or materially injure the Tribe. *See Martin v. Wilks*, 490 U.S. 755, 762 (1989) ("A judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings."), *superseded by statute on other grounds*, 42 U.S.C. § 2000e-2(n); *City of Warren v. City of Detroit*, 495 F.3d 282, 287 (6th Cir. 2007) ("[P]arties who choose to resolve litigation through settlement may not dispose of the claims of a third party . . . .") (quoting *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 529 (1986)).

¶23     Moreover, as a legal matter, nothing in the settlement leaves the Tribe any worse off with regard to the water available to satisfy its claims than it is now. Section 312(d) of the AWSA provides in part that "[t]he Nation and the United

14

States as Trustee . . . shall have the right to assert any claims granted by a State law implementing the groundwater protection program described in paragraph 8.8 of the Tohono O'odham settlement agreement." In turn, paragraph 8.8 of the Nation's settlement agreement requires the settling parties "to support the enactment of legislation by the State that would implement the groundwater protection program for the San Xavier Reservation."

¶24 As noted above, *see supra* ¶ 3, the legislature did enact the Groundwater Protection Program that will go into effect once this settlement is final and nonappealable and has been published in the Federal Register. *See* 2005 Ariz. Sess. Laws, ch. 143, § 15 (citing AWSA § 302(c)). This program is intended to control the amount of groundwater pumping that occurs near the Tribe's land. *See, e.g.*, A.R.S. § 45-2702 (providing that the adjudication court has jurisdiction over, among other things, the Groundwater Protection Program). Thus, the Tribe's claims of injury are premature and speculative. Moreover, because the program provides limits on pumping that did not exist before, it cannot by its own terms put the Tribe in a situation worse than its current one.

¶25 The Tribe asserts that a prior decision of this Court, *San Carlos Apache Tribe v. Superior Court ex rel. County of Maricopa*, holds that because of the finite nature of water

15

resources, a court must look behind the settlement to determine if the agreement "may affect the availability of water" for other claimants. 193 Ariz. 195, 213, ¶ 43, 972 P.2d 179, 197 (1999). The issue in *San Carlos Apache Tribe*, however, was whether, by requiring certain legal conclusions, the legislature violated the strict separation of powers mandated by the Arizona Constitution. *Id*. Here, in contrast, there is no separation of powers issue.[10]

**¶26** Also, the Tribe argues that this Court recognizes a violation of due process when a claimant is required to wait until injury occurs before pursuing remedies in the adjudication. *See id.*, 193 Ariz. at 212, ¶ 39, 972 P.2d at 196. However, in *San Carlos Apache Tribe,* the legislature had

---

[10] The Tribe misunderstands the import of other decisions by this Court as well. For example, the Tribe suggests that under our holding in *In Re the General Adjudication of All Rights to Use Water in the Gila River System and Source*, 212 Ariz. 64, 82, ¶ 67, 127 P.3d 882, 900 (2006), a party challenging water rights established in a decree must return to the originating court to challenge the decree. Our holding in that case, however, addressed the deference owed to the originating court when a party argued its entitlement to relief from an apparently *binding* decree. *Id*.

Similarly, the Tribe recognizes that Arizona law holds water rights are property rights and that notions of notice and an opportunity to be heard attach, but this observation is beside the point. *See Gila River I*, 171 Ariz. at 235-36, 830 P.2d at 447-48. The Tribe had sufficient notice and opportunity to be heard. The opportunity to be heard is not an opportunity to receive a particular result. And, in any event, the Tribe's water rights are not affected by the settlement agreement.

16

dictated the summary adjudication of "*de minimis* use" without judicial consideration of the impact on any individual watershed. *Id*. at ¶ 38. But, in compliance with the terms of the Special Order, *see* § (D)(6)(a), the quantity of water received by the Nation under the settlement is below the lowest amount of water the Nation might have succeeded in proving at trial. As a matter of law, therefore, the Tribe cannot demonstrate material injury to its water rights.

¶27    Because the Tribe is not bound by the judgment and decree approving the settlement, and the Nation will not receive more water than it could have proved at trial, the Tribe's argument that the settlement violates its due process rights is unfounded. *See Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 611 (1974) (postponement of judicial inquiry not an inherent denial of due process).

C

¶28    The Tribe argues that these proceedings may violate federal law by permitting a settlement that strips the adjudication of its "comprehensive" nature.

¶29    To be sure, the McCarran Amendment, 43 U.S.C. § 666, is crucial to the operation of state water adjudications. Under the amendment, the United States consents to waive its sovereign immunity and be bound by state court decisions in water adjudications. *Id.* The United States Supreme Court has held

17

under the amendment that federal courts should defer to state court adjudications, effectively forcing federally recognized tribes into the adjudication process. *See Arizona v. San Carlos Apache Tribe*, 463 U.S. 545, 569 (1983) ("The McCarran Amendment . . . allows and encourages state courts to undertake the task of quantifying Indian water rights in the course of comprehensive water adjudications."). Although the McCarran Amendment's purpose is to limit litigation and confusion over property rights, *id.*, the Tribe contends that allowing the settlement here to proceed would strip the adjudication of its comprehensive nature and jeopardize any submission to state court jurisdiction by the United States. But interpreting 43 U.S.C. § 666 in this manner would make it impossible for any settlement to occur. The McCarran Amendment and the related Supreme Court case law emphasize the resolution, not exacerbation, of water rights conflicts.

**D**

¶30 Next, the Tribe insists that the adjudication court should have stayed the proceedings until the ADWR assessment was revised to comply with that court's order requesting the assessment. But nothing in the court's order expressly required consideration of the impact of the settlement on the Tribe. Further, a technical assessment of the Tribe's rights is not relevant to determining material injury to the Tribe because it

18

is not bound by the settlement, and the settlement does not give the Nation any rights that it does not already hold. The Tribe's argument envisions a quantification of its rights as a precondition to a settlement of the Nation's rights. If that were the case, it would nearly be impossible for settlements such as this one to be reached.

E

¶31     The Tribe asserts that, by including in the judgment and decree a reference to the Nation's CAP contract, the adjudication court acted outside its jurisdiction. The judgment and decree entered by the adjudication court provides that under the terms of the settlement agreement, the Nation is entitled to 79,000 acre feet per year of water within the Tucson Active Management Area. The judgment and decree stated that 66,000 acre feet per year of this water "shall" be obtained through a CAP contract.

¶32     We agree that by describing the terms of the settlement it was approving, the adjudication court could not adjudicate rights beyond its jurisdiction. *See Maricopa-Stanfield Irrigation & Drainage Dist. v. Robertson (Smith)*, 211 Ariz. 485, 494, ¶ 57, 123 P.3d 1122, 1131 (2005). Congress, not the adjudication court, authorized amendments to the Nation's CAP contract in section 309(g) of the AWSA. The court merely stated the operative provisions of the agreement and the CAP

19

contract resulting from it.

**F**

**¶33**     Finally, the Tribe claims that, because the adjudication court relied on an allegedly incomplete ADWR assessment and did not hold an evidentiary hearing as required by § (D)(6) of the Special Order, the settling parties did not meet their burden of proof under the Special Order. This contention fails on several grounds.

**¶34**     First, the Special Order leaves to the discretion of the adjudication court whether to have an assessment prepared. Special Order § (B)(3)(f). Second, chapter 7 of ADWR's assessment addressed the probable impacts of the settlement, including impacts on water resources, on other claimants in the Gila River adjudication, and on groundwater rights.

**¶35**     Third, § (D)(5) of the Special Order provides that "[u]pon completion of all hearings on objections, . . . the general adjudication court shall enter a judgment either approving the stipulation and adjudicating the Indian water rights or water rights for other federal reservation[s] as set forth in the stipulation or declining to do so." Section (D)(6)(a) requires the court to approve a settlement if it determines "by a preponderance of the evidence" that the water rights "established in the settlement agreement . . . are no more extensive" than could be proved at trial. This section

20

further provides that "[i]n making this determination, the court may consider in addition to other evidence offered, the statement of claimant filed by the Indian tribe or federal agency and all supporting documentation." *Id.*

¶36 Here, the adjudication court appropriately considered the Statement of Claimant filed by the United States on behalf of the Nation and the supporting assessment by ADWR regarding the range of water rights the Nation could claim. As discussed above, *see supra* ¶ 26, the range of water rights set forth in these documents was greater than the rights granted under the Nation's settlement. Consequently, the adjudication court did not err in determining that the settling parties met their burden under the Special Order and that an evidentiary hearing was unnecessary.

**IV**

¶37 For the forgoing reasons, we accept interlocutory review and affirm the judgment and decree of the adjudication court in its entirety.

_____
Michael D. Ryan, Justice

CONCURRING:

_____
Ruth V. McGregor, Chief Justice

_____
Rebecca White Berch, Vice Chief Justice


_____
Andrew D. Hurwitz, Justice


_____
A. John Pelander, III, Judge*

* Justice W. Scott Bales has recused himself from this case. Pursuant to Article 6, Section 3 of the Arizona Constitution, the Honorable A. John Pelander, III, Judge of the Arizona Court of Appeals, Division Two, was designated to sit in this matter.