SUPREME COURT OF ARIZONA
En Banc

IN RE                                    )
                                         )
THE GENERAL ADJUDICATION OF ALL          )   Arizona Supreme Court
RIGHTS TO USE WATER IN THE GILA          )   Nos. WC-07-0001-IR and
RIVER SYSTEM AND SOURCE                  )        WC-07-0003-IR
                                         )
                                         )   Maricopa County
                                         )   Superior Court
                                         )   Nos. W-1, W-2, W-3, W-4
                                         )   (Consolidated)
                                         )
                                         )   (Contested Case
                                         )    No. W1-207)
                                         )
                                         )   **O P I N I O N**
                                         )
_____  )


Interlocutory Appeal from the Superior Court in Maricopa County
The Honorable Eddward P. Ballinger, Jr., Judge

**AFFIRMED**
_____

LAW OFFICE OF DOUGLAS C. NELSON, P.C.                          Phoenix
     By   Douglas C. Nelson
Attorney for Lower Gila Water Users, Town of Gila Bend,
Arlington Canal Company, Enterprise Ranch, Paloma Irrigation
& Drainage District and Various Individuals

THE SPARKS LAW FIRM, P.C.                                     Scottsdale
     By   Joe P. Sparks
          Laurel A. Herrmann
Attorneys for the San Carlos Apache Tribe and Tonto Apache Tribe

MONTGOMERY & INTERPRETER, P.L.C.                              Phoenix
     By   Susan B. Montgomery
          Robyn L. Interpreter
Attorneys for Yavapai-Apache Nation

GILA RIVER INDIAN COMMUNITY                                   Sacaton
     By   Jennifer K. Giff
          Rodney B. Lewis
          Timothy L. Pierson

                Ruth E. Koester
                Ann Marie Chischilly
                John T. Hestand                                    Chandler

And

AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.        Washington, DC
        By   Donald R. Pongrace
Attorneys for Gila River Indian Community

SALMON, LEWIS & WELDON, P.L.C.                          Phoenix
        By   John B. Weldon, Jr.
             Lisa M. McKnight
             M. Byron Lewis
Attorneys for Salt River Project, Salt River Project
Agricultural Improvement & Power District, and Salt River Valley
Water Users Association

SALMON, LEWIS & WELDON, P.L.C.                          Phoenix
        By   Riney B. Salmon, II
Attorneys for the San Carlos Irrigation & Drainage District

SALMON, LEWIS & WELDON, P.L.C.                          Phoenix
        By   Mark A. McGinnis
Attorneys for Maricopa-Stanfield Irrigation & Drainage District,
Central Arizona Water Conservation District, and Central Arizona
Irrigation and Drainage District

ENGELMAN BERGER, P.C.                                   Phoenix
        By   William H. Anger

And

CRAIG D. TINDALL, GLENDALE CITY ATTORNEY             Glendale
        By   Kent Russell Romney, Assistant City Attorney
Attorneys for City of Chandler, City of Glendale, City of
Scottsdale, and City of Mesa

BROWN & BROWN LAW OFFICES, P.C.                     Saint Johns
        By   David A. Brown
Attorneys for Franklin Irrigation District

LAW OFFICE OF L. ANTHONY FINES, P.C.                   Tucson
        By   L. Anthony Fines
Attorney for Gila Valley Irrigation District

RYLEY CARLOCK & APPLEWHITE PA                         Phoenix
     By   Cynthia M. Chandley
          John C. Lemaster
          L. William Staudenmaier, III
          Rhett A. Billingsley
          Sean T. Hood
Attorneys for Freeport-McMoRan Corporation and Roosevelt Water
Conservation District

UNITED STATES DEPARTMENT OF JUSTICE               Washington, DC
     By   John L. Smeltzer
          F. Patrick Barry
Attorneys for United States of America

NAVAJO NATION DEPARTMENT OF JUSTICE                Window Rock
     By   Stanley M. Pollack

And

MCELROY MEYER WALKER & CONDON PC                   Boulder, CO
     By   Scott McElroy
          Alice E. Walker
Attorneys for the Navajo Nation

MAGUIRE & PEARCE, P.L.L.C.                            Phoenix
     By   Michael J. Pearce
Attorneys for ASARCO LLC

MOYES SELLERS & SIMS LTD                             Phoenix
     By   Steven L. Wene
Attorneys for City of Safford

CURTIS, GOODWIN, SULLIVAN, UDALL & SCHWAB, P.L.C.    Phoenix
     By   William P. Sullivan
Attorneys for Town of Gilbert

BROENING, OBERG, WOODS & WILSON, P.C.               Phoenix
     By   Marilyn D. Cage
Attorneys for City of Goodyear

STEPHEN M. KEMP, PEORIA CITY ATTORNEY                Peoria
     By   Stephen J. Burg
Attorneys for City of Peoria

GARY VERBURG, PHOENIX CITY ATTORNEY                 Phoenix
     By   M. James Callahan, Assistant City Attorney
Attorneys for City of Phoenix

3

ANDREW B. CHING, TEMPE CITY ATTORNEY                    Tempe
     By   Charlotte Benson
Attorneys for City of Tempe
_____

**P E L A N D E R**, Justice

¶1        As part of the ongoing adjudication of rights to use

water in the Gila River System and Source,[1] the superior court

approved the settlement agreement of the Gila River Indian

Community ("GRIC").[2]  We accepted interlocutory review and now

affirm the judgment and decree of the adjudication court.

## Background

¶2        In   2004,   Congress   enacted   the   Arizona   Water

---

[1]    The background facts and procedural history of the Gila
River general stream adjudication are provided in several cases,
including *San Carlos Apache Tribe v. Superior Court*, 193 Ariz.
195, 202 ¶¶ 2-3, 972 P.2d 179, 186 (1999), and *In re Rights to
the Use of the Gila River (Gila River I)*, 171 Ariz. 230, 232-33,
830 P.2d 442, 444-45 (1992).

[2]    In  addition  to  GRIC,  the  settling  parties  include  the
United States; the State of Arizona; the Salt River Project
Agricultural Improvement and Power District; the Salt River
Valley  Water  Users'  Association;  the  Roosevelt  Irrigation
District;  the  Roosevelt  Water  Conservation  District;  Arizona
Water Company; the cities of Casa Grande, Chandler, Coolidge,
Glendale, Goodyear, Mesa, Peoria, Phoenix, Safford, Scottsdale,
and Tempe; the towns of Florence, Mammoth, Kearny, Duncan, and
Gilbert; the Maricopa-Stanfield Irrigation & Drainage District;
the Central Arizona Irrigation and Drainage District; Franklin
Irrigation  District;  Gila  Valley  Irrigation  District;  the  San
Carlos Irrigation and Drainage District; the Hohokam Irrigation
and  Drainage  District;  the  Buckeye  Irrigation  Company;  the
Buckeye  Water  Conservation  and  Drainage  District;  Central
Arizona Water Conservation District; Phelps Dodge Corporation;
and the Arizona Game and Fish Commission.  Agreement at 4.

Settlements Act ("AWSA"), Pub. L. No. 108-451, 118 Stat. 3478 (2004), as "part of a broader effort by federal, state, and tribal entities to resolve water rights issues" in this state. *In re Gen. Adjudication of All Rights to Use Water in the Gila River Sys. and Source (Gila River VII)*, 217 Ariz. 276, 278 ¶ 3, 173 P.3d 440, 442 (2007). Title II of the AWSA authorizes settlement of GRIC's federal water rights claims.[3] Under the settlement at issue here, GRIC will receive 653,500 acre-feet of water per year ("AFY") from a combination of sources, in return for which GRIC and the United States on GRIC's behalf waive claims to greater diversion rights, damages to water resources, and the right to contest certain uses of Gila River water.

¶3        In May 2006, the settling parties applied for approval of the GRIC settlement agreement with the adjudication court. The court ordered the Arizona Department of Water Resources ("ADWR") to prepare a factual and technical assessment of the settlement. ADWR submitted its assessment in August 2006.

¶4        The San Carlos Apache Tribe, Tonto Apache Tribe, and Yavapai-Apache Nation (collectively, the "Apache Tribes") objected on multiple grounds to the settlement agreement. The

---

[3]    "The [Gila River Indian Reservation] covers about 580 square miles or approximately 373,000 acres . . . and is located in Central Arizona, just south of the Phoenix metropolitan area in Maricopa and Pinal Counties." Ariz. Dep't of Water Resources, *Technical Assessment of the Gila River Indian Community Water Rights Settlement* ("Assessment") at 2-1 (2006).

Lower Gila Water Users ("LGWUs"), consisting of the Town of Gila Bend, Arlington Canal Company, Enterprise Ranch, Paloma Irrigation & Drainage District, and various individual appropriators of Gila River water, also objected, as did ASARCO LLC. In November 2006, the settling parties responded to the objections and moved for summary disposition. The Apache Tribes, the LGWUs, and ASARCO each responded to that motion, and the Apache Tribes and ASARCO cross-moved for summary disposition.

¶5 The adjudication court limited its inquiry to matters specified in this Court's 1991 Special Procedural Order Providing for the Approval of Federal Water Rights Settlements, Including Those of Indian Tribes ("Special Order"). The court determined that the Apache Tribes had no viable objections because the agreement did not affect their water rights. The court denied ASARCO's cross-motion and granted summary disposition against both ASARCO and the LGWUs on all their objections except claims pertaining to the quantity of water GRIC would receive under the settlement agreement. Those parties later stipulated that the water quantity was not more extensive than GRIC could show at trial.

¶6 Based on the parties' submissions of stipulated facts and exhibits, and confining its review to those matters prescribed in the Special Order, the adjudication court entered

6

a judgment and decree approving GRIC's settlement agreement. This Court granted the request of the Apache Tribes, the LGWUs, and ASARCO for interlocutory review. We have jurisdiction under Article 6, Section 5(3) of the Arizona Constitution. Motions for summary disposition of objections are considered under Arizona Rule of Civil Procedure 56. *See* Special Order § (D)(2). This Court reviews de novo the interpretation and application of the Special Order vis-à-vis settlement agreements as well as the adjudication court's grant of summary disposition. *See In re Gen. Adjudication of all Rights to Use Water in the Gila River Sys. and Source (Gila River VI)*, 212 Ariz. 64, 69 ¶ 12, 127 P.3d 882, 887 (2006); *Andrews v. Blake*, 205 Ariz. 236, 240 ¶ 12, 69 P.3d 7, 11 (2003).

¶7     The Special Order governs approval of settlement agreements involving the claims of Indian tribes to use water in the Gila River system and source. Special Order §§ (A)-(D); *see Gila River VII*, 217 Ariz. at 278-79 ¶ 10, 173 P.3d at 442-43. Under the Special Order, any claimant may file an objection asserting that (1) approval of the settlement agreement would cause material injury to its claimed water rights; (2) the conditions warranting the initiation of special proceedings have not been satisfied; or (3) the settlement agreement establishes water rights in the Gila River mainstem that are more extensive than the Indian tribe or federal agency would have been able to

7

prove at trial. Special Order § (C)(1). The adjudication court then resolves any motions for summary disposition of objections, considers discovery requests, and hears objections on matters for which summary disposition was not granted. *Id.* § (D)(1).

¶8 The Special Order requires the court to approve the settlement agreement if it finds by a preponderance of the evidence that there is a reasonable basis to conclude that the water rights granted in the agreement are no more extensive than the Indian tribe or federal agency could have proven at trial, the objector's claimed water rights are not materially injured or are preserved under the express terms of the settlement agreement, and the settlement agreement was reached in good faith. *Id.* § (D)(6); *see Gila River VII*, 217 Ariz. at 279 ¶ 12, 173 P.3d at 443.

¶9 This Court recently addressed the application of the Special Order in *Gila River VII*. There we noted:

> The balance struck by the Special Order seeks to prevent any tribe from using a settlement to gain additional rights to water while protecting other parties whose own rights would be injured by the settlement. At the same time, the Special Order provides for judicial approval when the settling tribe has taken steps to preserve other claimants' rights and remedies. Put simply, the expectation under the Special Order is that a settlement will be approved if the settling tribe is no better off than it would be after the final adjudication of all claims, and the settlement preserves the remedies of the

non-settling claimants.

217 Ariz. at 279 ¶ 13, 173 P.3d at 443. We concluded that the adjudication court is limited to considering the objections provided in the Special Order when deciding whether to approve a settlement agreement. *Id.* at 280-81 ¶¶ 16-20, 173 P.3d at 444-45. We reaffirm that conclusion.

## Objections

¶10     The Apache Tribes, the LGWUs, and ASARCO largely complain that the limited scope of settlement review provided in the Special Order unfairly prevents them from challenging settlements on constitutional and other grounds and from protecting their own claimed water rights. We disagree and find that the Special Order serves several important purposes.

¶11     The "size and complexity" of this general stream adjudication, initiated in 1974, are well documented. Joseph M. Feller, *The Adjudication That Ate Arizona Water Law*, 49 Ariz. L. Rev. 405, 407 (2007); *see also Gila River I*, 171 Ariz. at 232, 830 P.2d at 444 (noting, eighteen years ago, "[t]he procedural history of this adjudication is already complex"). Much of the adjudication has necessarily centered on the claims of Indian tribes, in part because of the "now well-established" principle that "the government, in establishing Indian or other federal reservations, impliedly reserves enough water to fulfill the purposes of each such reservation." *In re Gen. Adjudication of*

*All Rights to Use Water in the Gila River Sys. and Source (Gila River V)*, 201 Ariz. 307, 311 ¶ 9, 35 P.3d 68, 72 (2001) (discussing *Winters v. United States*, 207 U.S. 564 (1908)); *see also United States v. Superior Court*, 144 Ariz. 265, 270, 697 P.2d 658, 663 (1985) ("In the scheme of priorities, the claims . . . of the Indians rank high.").

¶12    "[M]uch of Arizona is arid desert land without sufficient water to meet all demands." *United States*, 144 Ariz. at 269, 697 P.2d at 662. "The problem, therefore, is clear." *Id*. at 270, 697 P.2d at 663. As this Court observed a quarter century ago:

> [T]he current state of our water supply is critical. . . . Since the amount of surface water available is insufficient to satisfy all needs, and since Arizona follows the doctrine of prior appropriation, it is unavoidable that the priority claims of large users will reduce, if not eliminate, the amount of water available to some of those with lower priority.

*Id*. (citations omitted).

¶13    Those words still ring true today. Viewed with those considerations in mind, the Special Order neither arbitrarily nor unfairly limits the scope of review of Indian tribe water settlements. Indian tribes alone originally claimed more water than is available in the Gila River system. Therefore, when Indian claims are settled and such settlements meet the conditions of the Special Order, it not only significantly

10

advances this adjudication but also benefits other non-settling parties, Indian and non-Indian alike, by reducing the claimed AFY of any one tribe to an amount below that which it could have proven at trial.  The Special Order preserves the objecting parties' ability to assert their various claims but defers consideration of some of them by the adjudication court and on appeal, a procedure consistent with this Court's general practice of avoiding interlocutory appeals.  Accordingly, we reject the broad challenges of the objecting parties to the Special Order and turn to the specific objections raised to the GRIC settlement.

### The Apache Tribes

¶14     The Apache Tribes first argue that, notwithstanding the Special Order, the adjudication court had an inherent duty to consider the constitutionality, legality, and fairness of the settlement agreement.  We rejected this argument in *Gila River VII*.  217 Ariz. at 279-80 ¶¶ 15-20, 173 P.3d at 443-44.[4]  These objections "fall outside the narrow scope of review mandated by the Special Order . . . [and] can be addressed at a later date

---

[4]     The Apache Tribes intervened in *Gila River VII* and joined with the Pascua Yaqui Tribe in making the same arguments the Apache Tribes urge here.  217 Ariz. at 279-80 n.6, ¶ 15, 173 P.3d at 443-44 n.6 (noting that "the Apache Tribes' objection to the adjudication court's interpretation of the Special Order [in this case] mirrors the one raised" in *Gila River VII* and that the issue raised in both cases "is the same").

without any injury to the Tribe[s] from delay." *Id.* at 280 ¶ 17, 173 P.3d at 444 (internal citation, quotation marks, and ellipses omitted).

**¶15** Nonetheless, in support of their argument, the Apache Tribes rely on *San Carlos Apache Tribe v. Superior Court*, 193 Ariz. 195, 972 P.2d 179 (1999). In that case, this Court considered the constitutionality of two legislative measures that revised several statutes addressing surface water rights and the adjudication process. *Id.* at 203 ¶ 4, 972 P.2d at 187. One statute required courts to decree settlement agreements but did not authorize judicial review of the agreements. *Id.* at 213 ¶ 43, 972 P.2d at 197. That statute, we held, violated the separation of powers doctrine because, "[i]n an *inter sese* proceeding such as this adjudication, a court cannot be required [by the legislature] to incorporate an agreement that may affect the availability of water for other claimants or interfere with senior rights." *Id.*

**¶16** Here, the adjudication court applied the Special Order, not a statute enacted by the legislature. Thus, there is no separation of powers issue, and because the Special Order expressly provides the terms under which we review Indian water rights settlements, the analysis in *San Carlos Apache Tribe* is

12

not applicable.[5]  *See Gila River VII*, 217 Ariz. at 281-82 ¶¶ 25-27, 173 P.3d at 445-46.

**¶17**     The Apache Tribes further assert the adjudication court erred as a matter of law in ruling that they lacked standing to claim material injury.  They argue that approval of the settlement agreement will adversely affect the water rights of the San Carlos Apache Tribe and may negatively impact the water rights of the Yavapai-Apache Nation in the future.

**¶18**     The adjudication court did not expressly state that the Apache Tribes lacked standing to contest the settlement.[6]

---

[5]     The Apache Tribes also ask us to address and resolve the differences between the procedural orders this Court entered in the Gila River and the Little Colorado River adjudications. Although the Little Colorado River Administrative Order permits the adjudication court to consider whether a settlement agreement "is fair, adequate, reasonable, and consistent with applicable law," that order is not before us, and we again "decline to revisit the Special Order" that has controlled this adjudication for almost two decades.  *Gila River VII*, 217 Ariz. at 280 n.8, ¶ 16, 173 P.3d at 444 n.8.

[6]     The adjudication court stated that

> [its] limited review of the proposed settlement mandates a finding that the Apache Tribes, like the Navajo Nation, cannot put forth a viable objection in this special proceeding.  This is true because approval of the settlement agreement and the proposed judgment and decree cannot affect the Apache Tribes' water rights, claims or entitlements to water.

Minute Entry, Mar. 7, 2007.  Using that same language a month earlier, the adjudication court ruled that the Navajo Nation "lacks standing to object" to the approval of the GRIC

13

Rather, the court correctly ruled that their objections fell outside the limited scope of review prescribed by the Special Order. A settlement agreement will be approved if the adjudication court determines, among other things, that the objector's water rights are not materially injured *or* are preserved "under the express terms of the settlement agreement." Special Order § (D)(6)(b). Because those two conditions are disjunctive, the adjudication court must approve the settlement agreement as long as the agreement expressly states that the objector is not bound and is free to pursue its claims in the general adjudication. *See Gila River VII*, 217 Ariz. at 279 ¶ 13, 173 P.3d at 443.

¶19    The "express terms" of the GRIC settlement agreement provide that "[n]othing in this Agreement shall be construed to quantify or otherwise affect the Water Rights, claims or entitlements to Water of any tribe, band or community other than [GRIC]." Agreement ¶ 30.22. Similar language appears in paragraph 23 of the adjudication court's judgment and decree. Indeed, the AWSA itself prohibits the agreement from affecting the water rights of any other Indian tribe. AWSA §§ 213(b), 401. Because the Apache Tribes "retain all remedies available

settlement agreement. Minute Entry, Feb. 23, 2007. No claims, objections, or rulings relating to the Navajo Nation are before us in this proceeding.

14

before approval of the settlement necessary to protect their rights in the general adjudication[,]" approval of the settlement agreement did not hinge on absence of any material injury to the Apache Tribes. *Gila River VII*, 217 Ariz. at 281 ¶ 22, 173 P.3d at 445. And, in any event, because the settlement agreement does not affect their rights or remedies, it cannot materially injure them. *See id.*

¶20    The Apache Tribes next claim that ADWR did not comply with the adjudication court's order requiring it to factually and technically assess the proposed settlement. Therefore, they assert, the court did not have an informed basis on which to determine whether the settlement agreement adversely affected their water rights. The Apache Tribes further argue they were entitled to a hearing on the merits of their material-injury objection.

¶21    Pursuant to the court's order, ADWR produced a technical assessment that included a chapter addressing the "probable impacts of the settlement agreement" on both water resources and other claimants. Assessment at ch. 7. Nothing in the court's order required ADWR to specifically consider the impact of the settlement agreement on the Apache Tribes. Furthermore, an assessment of their rights (by either a technical analysis or a hearing on the merits) is irrelevant to a finding of material injury because the Apache Tribes are not

15

bound by the settlement agreement. *See Gila River VII*, 217 Ariz. at 282 ¶ 30, 173 P.3d at 446.

¶22    The Apache Tribes also contend the adjudication court never saw the executed version of the settlement agreement. But the judgment and decree expressly states that the court considered "the Amended and Restated Settlement Agreement dated October 21, 2005." And in the original application for special proceedings, the settling parties stated that copies of the agreement were available for inspection at ADWR as well as every county's superior court clerk's office. Application at 4 ¶ 3.[7] Therefore, we find no merit to this argument.

¶23    Finally, the Apache Tribes assert that GRIC will receive more water by settlement than it could have established at trial. The settlement agreement provides GRIC with 653,500 AFY, which includes 328,800 AFY of Central Arizona Project ("CAP") water, 156,700 AFY of underground water, 155,400 AFY of surface water,[8] and 12,600 AFY of reclaimed water. Agreement ¶ 4.1. Because CAP water is not from the Gila River system and

---

[7]    The application is available at http://www.azwater.gov/AzDWR/StatewidePlanning/Adjudications/AZWaterSettlements.htm (last visited Feb. 17, 2010).

[8]    The surface water is composed of 125,000 AFY under the 1935 Globe Equity Decree; 5,900 AFY furnished by the Salt River Project in lieu and satisfaction of GRIC's rights under the 1903 Haggard Decree; 4,500 AFY of water from Roosevelt Water Conservation District; and 20,000 AFY of Salt River Project stored water. Assessment at 3-2, 3-8 to 3-11.

source and is outside the adjudication court's jurisdiction, we exclude that water from our analysis.

¶24      In the adjudication, GRIC claimed aboriginal rights of 934,805 AFY, federal reserved rights of almost 2.5 million AFY, and prior appropriative rights of 2.7 million AFY.  The United States on GRIC's behalf also asserted a right to more than 1.5 million AFY.  Assessment at 4-4 to 4-9.  In addition, according to ADWR, the total average water use on the GRIC reservation for both agricultural and non-agricultural purposes is between 760,586 and 1,347,500 AFY.  *Id.* at 8-4.

¶25      The settlement plainly provides for fewer AFY than GRIC was allocated under the Globe Equity Decree ("Decree").[9] GRIC is entitled to at least 967,215 AFY under that Decree,[10] consisting of (1) 303,276 AFY (210,000 AFY with a time immemorial priority and 93,276 AFY with a 1924 priority) from the Gila River mainstem for 50,546 acres of GRIC's reservation, Decree, Articles V, VI(1)-(4); (2) 17,950 AFY of natural flow

_____

[9]      The Globe Equity Decree, which is under the jurisdiction of the federal district court, "defines and adjudicates the claims and rights of the parties [in that case to the use of the Gila River mainstem] by listing the dates of priority and amounts of water to which each is entitled.  The Decree also specifies the places at which the parties may divert water." *Gila River VI*, 212 Ariz. at 67 ¶¶ 6-7, 127 P.3d at 885 (internal quotation marks omitted).

[10]      Although not binding on the Apache Tribes, the LGWUs stipulated that the total quantity of existing water rights held

water rights ranging in priority from 1873-1903 for 2,992.5 acres, *id.* Article VI(6); (3) 645,989 AFY of stored water with a 1924 priority date for 50,546 acres, which is GRIC's pro rata allocation of the San Carlos Irrigation Project's right to 1,285,000 AFY stored in the San Carlos Reservoir, *id.* Article VI(5); and (4) an unspecified amount of pumped groundwater, *id.* Article VII.

¶26     In sum, the water claimed on behalf of GRIC, its current water use, and GRIC's Globe Equity Decree rights are each considerably greater than the amount allocated to it under the settlement agreement. Accordingly, the adjudication court had "a reasonable basis to conclude that [GRIC's] water rights . . . established in the settlement agreement . . . are no more extensive than [GRIC] would have been able to prove at trial." Special Order § (D)(6)(a).

¶27     To the extent the Apache Tribes argue the GRIC settlement adversely affects the quality of their water, we conclude that the determination whether an Indian tribe receives more water by settlement than it could have shown at trial is limited to an analysis of water quantity. Settlement approval does not hinge on a finding that the quality of other claimants' water is unaffected. This limitation is necessary because of

by GRIC and the United States on GRIC's behalf under the Globe Equity Decree was at least 967,215 AFY.

18

the nature of the adjudication proceedings, in which parties are settling disputes over water rights at different times and with different parties. The consideration of any factors relating to water quality is not encompassed by the Special Order, would be fraught with speculation, and would unduly hinder and delay settlements.

¶28    Although water quality is not a necessary or appropriate consideration under the Special Order, claimants may still assert their rights to a higher quality of water in the general stream adjudication, unless prohibited by agreements, prior decrees, or court rulings. The Apache Tribes' objection about the quality of their water fails here, however, because it falls outside the Special Order's scope of review.

### The LGWUs

¶29    The LGWUs first argue material injury because the lack of priority dates and other attributes for the sources of water in the agreement makes it impossible to tell if water will be available to fulfill their water rights.[11]  But the water from the Gila River system allocated to GRIC under the settlement agreement retains all its pre-existing attributes and, as noted below, the LGWUs are not bound by the settlement. Thus, if the

---

[11]    In oral argument, the LGWUs claimed that seventy-two percent of GRIC's reservation was created after they first diverted water from the Gila River.

LGWUs are unable to obtain sufficient water to satisfy their claimed entitlement, they remain free to assert their rights in the general stream adjudication. That GRIC's settlement means it no longer will serve in its traditional adversarial role against various upstream water users does not establish material injury to the LGWUs.

¶30 The LGWUs also contend that applying the Special Order to preclude them from litigating their objections to this settlement violates their procedural and substantive due process rights. Specifically, the LGWUs argue that the settlement agreement results in a taking of their vested property rights by preventing them from making calls on the river, confirming water rights among the settling parties, requiring parties whose claims have not been adjudicated to contribute water to GRIC, and granting to other users (via the settlement agreement's "safe harbor" provisions) water rights that displace their senior rights. The Special Order, the LGWUs assert, prevents them from pursuing and establishing those claims.

¶31 In upholding the Special Order's application in *Gila River VII*, however, we stated that, "[t]hrough the Special Order, this Court sought to balance the rights of Indian tribes to seek settlement of their claims against the rights of other claimants." 217 Ariz. at 279 ¶ 11, 173 P.3d at 443. For the reasons discussed earlier, *supra* ¶¶ 10-13, we are not inclined

20

to overturn or deviate from the Special Order at this late date, particularly when doing so would frustrate or unduly delay good-faith settlements. Therefore, the adjudication court correctly rejected the LGWUs' broad challenge to the Special Order itself and, instead, properly focused on whether any of their objections fell within the Special Order's limited scope.

¶32     The LGWUs next assert that the adjudication court's judgment and decree unlawfully binds them because the settlement agreement does not expressly provide otherwise. The LGWUs are not bound by the settlement or judgment, however, because they are not settling parties and did not sign either the settlement agreement or the proposed Paloma Agreement.[12] *See Martin v. Wilks*, 490 U.S. 755, 762 (1989) ("A judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings."), *superseded by statute on other grounds*, 42 U.S.C. § 2000e-2(n) (1991); *see also Gila River VII*, 217 Ariz. at 281 ¶ 22, 173 P.3d at 445.

¶33     Paragraph 24 of the judgment and decree provides:

> Nothing in the Settlement Agreement shall

---

[12]    The Paloma Agreement was offered for the LGWUs' acceptance until the enforceability date of the settlement agreement. The Paloma Agreement provided that GRIC and the United States would not challenge the LGWUs' water claims, and in return the LGWUs would refrain from objecting to GRIC's use of water in accordance with the settlement agreement.

21

> affect the right of any Party, other than the Community and the United States, on behalf of the Community, Members and Allottees, to assert any priority date or quantity of water for Water Rights claimed by such Party in the Gila River Adjudication or other court of competent jurisdiction.

In a footnote, the judgment and decree states that "[c]apitalized terms used [therein] shall be as defined in the Settlement Agreement." And the settlement agreement states the term "'Party' shall mean an entity represented by a signatory to this Agreement." Agreement ¶ 2.129.

¶34    Nonetheless, in accordance with the clear intent of the adjudication court, the understanding of the settling parties, applicable legal principles, and common sense, we interpret "Party" in the judgment and decree as including all parties in the general stream adjudication. Based on this interpretation of the judgment and decree, with which GRIC and the United States agreed at oral argument in this Court, neither the LGWUs nor any other non-settling claimants (such as ASARCO) in the adjudication are bound by the terms of the settlement agreement or otherwise prevented from asserting their rights to Gila River water.

¶35    Although the GRIC settlement agreement provides, with certain exceptions pertaining to Indian tribes, that the Globe Equity Decree "shall be binding upon all parties" to these proceedings, the adjudication court omitted that provision from

22

its judgment and decree. As that court pointed out, however, Arizona Revised Statutes (A.R.S.) § 45-257(B)(1) (2003) requires the adjudication court to accept the determination of water rights and the appropriation dates in prior decrees unless such rights have been abandoned.[13] *Id.* Thus, although the LGWUs may argue they have higher priority rights, they cannot deny that GRIC and the United States on GRIC's behalf possess the rights and priority dates set forth in prior decrees, absent abandonment.

¶36     Among other constitutional challenges, the LGWUs argue the settlement agreement's safe harbor provisions create an unconstitutional riparian system of water allocation. Under those provisions, GRIC, the San Carlos Irrigation & Drainage District, and the United States agreed not to challenge, object to, or call on qualified users that were not parties to the Globe Equity Decree as long as their water use complied with stated conditions. Agreement ¶¶ 26.8.1, 26.8.2.1, 26.8.2.3. The LGWUs also claim the settlement agreement violates Arizona's severance and transfer of water rights statute, *see* A.R.S. § 45-

---

[13]     The Globe Equity Decree, *see supra* note 9, is discussed in *Gila River VI*, 212 Ariz. at 67 ¶¶ 4-7, 127 P.3d at 885. According to ADWR's technical assessment of the GRIC settlement, the 1903 Haggard Decree, entered in an action the United States filed, "recognized the rights of [GRIC] lands and established the number of acres and associated priority dates ranging from pre-1894 through 1901." Assessment at 3-10, n.9.

172(A)(5), because the Paloma Irrigation & Drainage District did not approve any changes in the points of diversion or places of use for the water sources in the agreement.

¶**37**        As did many of the objections raised in *Gila River VII*, however, the LGWUs' constitutional and statutory arguments fall outside the Special Order's limited scope of review and can be addressed at a later date without injury to the LGWUs.[14]   217 Ariz. at 280 ¶ 17, 173 P.3d at 444.   In any event, the safe harbor provisions do not change the system for allocating water – they simply protect eligible users with junior water rights from receiving a call from GRIC to satisfy its senior rights. The provisions also do not prevent any other party from asserting its priority water rights.   In addition, because the LGWUs are not bound by the settlement agreement, they may seek relief if the safe harbor provisions ultimately result in an adverse impact on their water rights.   *See Gila River VII*, 217 Ariz. at 280 ¶ 19, 173 P.3d at 444.   Likewise, the Paloma Irrigation & Drainage District may bring a claim later if it determines that water is being contributed to GRIC in violation of A.R.S. § 45-172(A)(5).

---

[14]   For that same reason, we do not address the Apache Tribes' challenges to the safe harbor provisions on constitutional grounds, first raised belatedly in their reply brief.   *See Webster v. Culbertson*, 158 Ariz. 159, 163, 761 P.2d 1063, 1067 (1988) (issue not raised and argued in opening brief is waived).

24

¶38    The LGWUs next assert the adjudication court should have included CAP and Blue Ridge stored water when it considered the quantity of water GRIC obtained by settlement. In its assessment, however, ADWR excluded only CAP and reclaimed water from its determination whether GRIC settled for less water than it could have proven at trial.[15] Assessment at 8-4 to 8-5. CAP water is delivered pursuant to contract with the federal government and is not subject to appropriation under state law. *Maricopa-Stanfield Irrigation & Drainage Dist. v. United States*, 158 F.3d 428, 431 (9th Cir. 1998). Therefore, CAP water, which is outside the jurisdiction of the adjudication court, was properly excluded from ADWR's analysis. *See Gila River VII*, 217 Ariz. at 283 ¶¶ 31-32, 173 P.3d at 447.

¶39    Finally, the LGWUs claim that the settlement agreement breaches the 1945 Arlington Agreement, in which GRIC and the United States agreed to restrict their water use on the reservation so that Arlington Canal Company would continue to receive water flows. The settlement agreement, however, does not alter Arlington's rights under the Arlington Agreement or prevent Arlington from asserting such rights. In addition, as

---

[15]    ADWR included Blue Ridge stored water (an average of 500 AFY) in its analysis because, when this water is provided under certain conditions, the amount of underground water specified in the agreement was reduced by an equivalent amount. Agreement ¶ 4.1, n.2.

noted above, we interpret the judgment and decree to preserve the rights of all non-settling parties in the adjudication.[16] In sum, the adjudication court did not err in rejecting the LGWUs' objections to the settlement.

**ASARCO**

¶40 ASARCO is a successor in interest to Kennecott Copper Corporation, which was a party to the Globe Equity Decree. The Decree allows ASARCO to withdraw up to 16,221 AFY from the Gila River mainstem.

¶41 ASARCO first argues the GRIC settlement agreement breaches the 1977 Water Rights Settlement and Exchange Agreement ("1977 Agreement"), in which ASARCO agreed that it would either pay for or provide an equivalent amount of CAP water to GRIC in exchange for any water diverted from the Gila River. The 1977 Agreement also gives ASARCO priority over Gila River water received in exchange for CAP water.

¶42 This contract claim falls outside the scope of review allowed by the Special Order. *See Gila River VII*, 217 Ariz. at 280 ¶ 17, 173 P.3d at 444. Moreover, the 1977 Agreement (¶ 35) states that "all actions for the enforcement . . . of this

---

[16] The LGWUs also argue that ADWR failed to obey the adjudication court's order to analyze the impact of the settlement agreement on other claimants' water rights. We have considered and rejected the same objection made by the Apache Tribes. *See supra* ¶¶ 20-21.

AGREEMENT shall be brought in courts of the United States." Thus, if the GRIC settlement causes a breach of the 1977 Agreement, ASARCO may assert its rights under that agreement in federal court.

¶43     ASARCO next asserts that it is materially injured because the settlement, through the operation of A.R.S. § 45-257(B)(1), improperly extends the reach of the Globe Equity Decree to Gila River tributaries.  Specifically, the settlement agreement provides that GRIC shall have the right to 653,500 AFY from several water sources, including a variable quantity of water diverted pursuant to GRIC's Globe Equity Decree rights with time immemorial priority.  ASARCO contends that users of the San Pedro River are now arguably bound by GRIC's time immemorial priority on that tributary, even though the relative priority of rights must still be determined in the adjudication.

¶44     ASARCO's claims to the San Pedro are unaffected. "[T]he [Globe Equity] Decree adjudicated only claims to the Gila River mainstem and not to its tributaries.  The Decree therefore has no preclusive effect as to the tributaries." *Gila River VI*, 212 Ariz. at 76 ¶ 38, 127 P.3d at 894.  ASARCO remains free to assert its claim of senior rights to the San Pedro River when the relative water rights of that tributary are determined in

27

the general stream adjudication.[17]

**¶45**     ASARCO further contends the settlement agreement's safe harbor provisions deny it equal protection and confer special benefits to GRIC in violation of the Arizona Constitution.  Specifically, ASARCO asserts the Upper Gila River Watershed Maintenance Program, described below, uses state legislation to implement protections against certain new water uses and to regulate existing uses, but permits the settling parties to decide independently who benefits from these protections.  ASARCO claims that, were it not expressly excluded by name in the agreement, it would have qualified for protection under the safe harbor provisions.

**¶46**     The adjudication court, however, correctly declined to address ASARCO's safe-harbor argument as outside the scope of the Special Order.  *Gila River VII*, 217 Ariz. at 280 ¶ 17, 173 P.3d at 444.  ASARCO's claim is flawed for other reasons.  In the settlement agreement, ¶ 26.8.1, the settling parties agreed to establish the Upper Gila River Watershed Maintenance Program

---

[17]     Because the judgment and decree provides GRIC with the right to divert water from the Gila River mainstem, however, the water users of the tributaries may be affected due to the limited amount of available Gila River water.  "[P]rior appropriations of the water of the main stream include the right to the waters of the tributaries, above the points of diversion, to the full extent of those prior appropriations."  Clesson S. Kinney, *A Treatise on the Law of Irrigation and Water Rights*, § 649, at 1137 (2d ed. 1912).

28

("Program"). The Program was enacted by the legislature, codified in A.R.S. §§ 45-2601 to 45-2654, and created the Gila River Maintenance Area. Subject to specified exceptions, the Program prohibits the construction of new dams, the enlargement of existing dams, and new irrigation of lands within this area.[18] A.R.S. §§ 45-2631, 45-2641; Assessment at 3-14. The Program applies to all persons who contemplate performing any of these acts in the maintenance area.

¶47 As discussed above, the settlement agreement's safe harbor provisions restrict the ability of GRIC, the San Carlos Irrigation & Drainage District, and the United States to challenge, object to, or call on specified users provided they meet certain conditions and the Program remains in effect. Agreement ¶¶ 26.8.1, 26.8.2.1, 26.8.2.3; Assessment at 3-14 to 3-15. The specified users primarily consist of those "persons, entities, corporations, or municipal corporations [and their successors] . . . in the Gila River Watershed above Ashurst-Hayden Diversion Dam . . ., [whose] Diversion is not specifically authorized by the Globe Equity Decree." Agreement ¶ 2.124B. ASARCO and some others are expressly excluded from this definition. *Id.*

---

[18] The irrigation of land in the maintenance area is prohibited unless the land was being irrigated between January 1, 2000 and August 12, 2005. Assessment at 3-14.

29

¶48     Although the Program was enacted by the legislature, the safe harbor provisions were not statutorily prescribed but rather are merely part of the settlement agreement among the parties.   The settling parties were entitled within their agreement to treat certain water users differently based on their past relationship with them.  *See Goodman v. Newzona Inv. Co.*, 101 Ariz. 470, 474, 421 P.2d 318, 322 (1966) ("[E]quity respects and upholds the fundamental right of the individual to complete freedom to contract or decline to do so, as he conceives to be for his best interests, so long as his contract is not illegal or against public policy." (quoting *McCall v. Carlson*, 172 P.2d 171, 187-88 (Nev. 1946))).  ASARCO differs from the water users who qualified for the safe harbor because it is a party to the Globe Equity Decree, is in a contractual relationship with a settling party (the 1977 Agreement), and was in the process of negotiating another exchange agreement with GRIC.[19]  Regardless of its treatment within the settlement agreement, ASARCO remains subject to the statutory provisions of the Program, as do all other entities in the region.  Therefore, the agreement neither violates ASARCO's equal protection rights nor confers special benefits to GRIC.

---

[19]  According to ASARCO, negotiations for the new exchange agreement were part of the overall settlement process but failed to result in a new agreement.

30

¶49     ASARCO also argues that the safe harbor provisions confer benefits on GRIC that are qualitatively greater than it would otherwise have been able to prove at trial. Specifically, ASARCO claims that the safe harbor provisions provide GRIC with "selective call" in that GRIC, unlike other downstream appropriators, can pick and choose which upstream users will be called to fulfill its senior water rights.

¶50     Again, the determination whether an Indian tribe has received more water than it could have established at trial is limited to consideration of water quantity. Thus, as with the Apache Tribes' quality-related arguments, we conclude that qualitative factors pertaining to water rights accorded to GRIC under the settlement are outside the Special Order's scope of review. Thus, ASARCO's objection is without merit.

¶51     Finally, ASARCO contends it is materially injured because the agreement's safe harbor provisions increase the risk of "rebound call." A "rebound call" occurs when an upstream user increases its water use, thereby decreasing the flow to a downstream user, which in turn causes the downstream user to call on other upstream users for water who had not caused its depletion.

¶52     This argument is premature and speculative, as ASARCO did not present any evidence that the settlement agreement has caused an increased incidence of such calls. In any event, if

the safe harbor provisions result in GRIC increasing the calls on ASARCO, ASARCO can assert in federal court its Globe Equity Decree rights to Gila River water. In addition, although GRIC must refrain from calling on certain qualified junior users under those provisions, ASARCO can still call on such users in accordance with its higher priority rights.

## Disposition

¶53       For the reasons stated above, we affirm the judgment and decree of the adjudication court.


_____
                        A. John Pelander, Justice


CONCURRING:


_____
Rebecca White Berch, Chief Justice


_____
Andrew D. Hurwitz, Vice Chief Justice


_____
Michael D. Ryan, Justice


_____
Ann A. Scott Timmer, Judge[*]

_____

[*]     Justice W. Scott Bales has recused himself from this case. Pursuant to Article 6, Section 3 of the Arizona Constitution, the Honorable Ann A. Scott Timmer, Chief Judge of the Arizona Court of Appeals, Division One, was designated to sit in this matter.